# **EXHIBIT A**

**IN THE SUPERIOR/STATE COURT OF** Decatur _____ **COUNTY**

## STATE OF GEORGIA

MEREDIAN HOLDINGS GROUP, INC., _____

MEREDIAN, INC. and DANIMER SCIENTIFIC, LLC, _____

_____

**PLAINTIFF**

Vs.

PAUL PEREIRA, ALTON GROUP, LLC, ALTON

CONSULTING GROUP, LLC., ALTON GROUP, INC.,

_____

ALTON BIO, LLC, ALTON BIO I, LLC., RACHAEL PEREIRA and
THE HOUSE OF MIAMI, LLC.,

**DEFENDANT**

CIVIL ACTION
NUMBER 16CV00254

FILED IN OFFICE
2016 May 18 01:55 PM
CECILIA WILLIS
CLERK OF SUPERIOR COURT
DECATUR COUNTY, GEORGIA
2016-119

### SUMMONS

TO THE ABOVE NAMED DEFENDANT: Paul Pereira, 1521 Alton Road, Miami Beach, Fl 33139

You are hereby summoned and required to file with the Clerk of said court and
serve upon the Plaintiff's attorney, whose name and address is:

Patricia G. Griffith
Leanne C. Mehrman
271 17th Street, N.W., Suite 1900
Atlanta, Georgia 30363
(404) 888-3800

an answer to the complaint which is herewith served upon you, within 30 days after
service of this summons upon you, exclusive of the day of service.  If you fail to do so,
judgment by default will be taken against you for the relief demanded in the complaint.

This 18th day of May , 2016 .

Clerk of Superior Court/State Court

By: _____

**Deputy Clerk**

SC-1 Rev. 85

**IN THE ~~SUPERIOR~~/STATE COURT OF** Decatur                    **COUNTY**

**STATE OF GEORGIA**

MEREDIAN HOLDINGS GROUP, INC.,                **CIVIL ACTION**
                                              **NUMBER** 16CV00254

MEREDIAN, INC. and DANIMER SCIENTIFIC, LLC,

_____

                                    **PLAINTIFF**
                    Vs.
PAUL PEREIRA, ALTON GROUP, LLC, ALTON

CONSULTING GROUP, LLC., ALTON GROUP, INC.,

ALTON BIO, LLC, ALTON BIO I, LLC., RACHAEL PEREIRA and
THE HOUSE OF MIAMI, LLC.,
                                    **DEFENDANT**

FILED IN OFFICE
2016 May 18 01:55 PM
CECILIA WILLIS
CLERK OF SUPERIOR COURT
DECATUR COUNTY, GEORGIA
2016-119

## SUMMONS

**TO THE ABOVE NAMED DEFENDANT:** Alton Group, LLC, 1521 Alton Road, Miami Beach, FL 33139

        You are hereby summoned and required to file with the Clerk of said court and
serve upon the Plaintiff's attorney, whose name and address is:

    Patricia G. Griffith
    Leanne C. Mehrman
    271 17th Street, N.W., Suite 1900
    Atlanta, Georgia 30363
    (404) 888-3800

an answer to the complaint which is herewith served upon you, within 30 days after
service of this summons upon you, exclusive of the day of service.  If you fail to do so,
judgment by default will be taken against you for the relief demanded in the complaint.

This 18th day of May, 2016.

                            Clerk of ~~Superior~~ Court/State Court

                    By: Debbie Harter
                                        **Deputy Clerk**

SC-1 Rev. 85

IN THE ~~SUPERIOR~~/STATE COURT OF  Decatur _____ COUNTY

## STATE OF GEORGIA

MEREDIAN HOLDINGS GROUP, INC.,

MEREDIAN, INC. and DANIMER SCIENTIFIC, LLC,

CIVIL ACTION NUMBER  16 CV00254

_____
PLAINTIFF

Vs.

PAUL PEREIRA, ALTON GROUP, LLC, ALTON

CONSULTING GROUP, LLC., ALTON GROUP, INC.,

ALTON BIO, LLC, ALTON BIO I, LLC., RACHAEL PEREIRA and
THE HOUSE OF MIAMI, LLC.,
DEFENDANT

FILED IN OFFICE
2016 May 18 01:55 PM
CECILIA WILLIS
CLERK OF SUPERIOR COURT
DECATUR COUNTY GEORGIA
2016-119

### SUMMONS

**TO THE ABOVE NAMED DEFENDANT:** Alton Consulting Group, LLC, 1521 Alton Road, Miami Beach, FL 33139

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

Patricia G. Griffith
Leanne C. Mehrman
271 17th Street, N.W., Suite 1900
Atlanta, Georgia 30363
(404) 888-3800

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This  18th  day of  May _____ , 2016 .

Clerk of ~~Superior~~ Court/State Court

By: _____
                                    **Deputy Clerk**

SC-1 Rev. 85

IN THE (SUPERIOR)/STATE COURT OF __Decatur_____ COUNTY

## STATE OF GEORGIA

MEREDIAN HOLDINGS GROUP, INC.,

MEREDIAN, INC. and DANIMER SCIENTIFIC, LLC,

CIVIL ACTION NUMBER __16CV00254__

FILED IN OFFICE
2016 May 18 01:55 PM
CECILIA WILLIS
CLERK OF SUPERIOR COURT
DECATUR COUNTY, GEORGIA
2016-119

**PLAINTIFF**

Vs.

PAUL PEREIRA, ALTON GROUP, LLC, ALTON
CONSULTING GROUP, LLC., ALTON GROUP, INC.,

ALTON BIO, LLC, ALTON BIO I, LLC., RACHAEL PEREIRA and
THE HOUSE OF MIAMI, LLC.,

**DEFENDANT**

## SUMMONS

TO THE ABOVE NAMED DEFENDANT: Alton Group, Inc., 1521 Alton Road, Miami Beach, FL 33139

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

Patricia G. Griffith
Leanne C. Mehrman
271 17th Street, N.W., Suite 1900
Atlanta, Georgia 30363
(404) 888-3800

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This __18th__ day of __May__, __2016__.

Clerk of (Superior) Court/State Court

By: __Debbie Harter__

**Deputy Clerk**

SC-1 Rev. 85

IN THE SUPERIOR/STATE COURT OF _Decatur_____ COUNTY

**STATE OF GEORGIA**

MEREDIAN HOLDINGS GROUP, INC.,  

MEREDIAN, INC. and DANIMER SCIENTIFIC, LLC,  

CIVIL ACTION  
NUMBER _16CV00254_

FILED IN OFFICE  
2016 May 18 01:55 PM  
CECILIA WILLIS  
CLERK OF SUPERIOR COURT  
DECATUR COUNTY, GEORGIA  
2016-119

**PLAINTIFF**

Vs.

PAUL PEREIRA, ALTON GROUP, LLC, ALTON  
CONSULTING GROUP, LLC., ALTON GROUP, INC.,  

ALTON BIO, LLC, ALTON BIO I, LLC., RACHAEL PEREIRA and  
THE HOUSE OF MIAMI, LLC.,  
**DEFENDANT**

**SUMMONS**

TO THE ABOVE NAMED DEFENDANT: Alton Bio, LLC, 1521 Alton Road, Miami Beach, FL 33139

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

Patricia G. Griffith  
Leanne C. Mehrman  
271 17th Street, N.W., Suite 1900  
Atlanta, Georgia 30363  
(404) 888-3800

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This _18th_ day of _May_____, _2016_.

Clerk of Superior Court/State Court

By: _____

**Deputy Clerk**

SC-1 Rev. 85

IN THE ~~SUPERIOR~~/STATE COURT OF ___Decatur_____ **COUNTY**

## STATE OF GEORGIA

MEREDIAN HOLDINGS GROUP, INC.,

MEREDIAN, INC. and DANIMER SCIENTIFIC, LLC,

CIVIL ACTION
NUMBER _16CV00254_

_____
PLAINTIFF
Vs.
PAUL PEREIRA, ALTON GROUP, LLC, ALTON
CONSULTING GROUP, LLC., ALTON GROUP, INC.,

ALTON BIO, LLC, ALTON BIO I, LLC., RACHAEL PEREIRA and
THE HOUSE OF MIAMI, LLC.,
DEFENDANT

FILED IN OFFICE
2016 May 18 01:55 PM
CECILIA WILLIS
CLERK OF SUPERIOR COURT
DECATUR COUNTY, GEORGIA
2016-119

### SUMMONS

TO THE ABOVE NAMED DEFENDANT: Alton Bio I, LLC, 1521 Alton Road, Miami Beach, FL 33139

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

Patricia G. Griffith
Leanne C. Mehrman
271 17th Street, N.W., Suite 1900
Atlanta, Georgia 30363
(404) 888-3800

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This __18th__ day of __May_____, 2016.

Clerk of Superior Court/State Court

By: _Debbie Harter_____
Deputy Clerk

SC-1 Rev. 85

IN THE ⟨SUPERIOR⟩/STATE COURT OF ___Decatur_____ COUNTY

**STATE OF GEORGIA**

MEREDIAN HOLDINGS GROUP, INC., _____

MEREDIAN, INC. and DANIMER SCIENTIFIC, LLC, _____

CIVIL ACTION
NUMBER 16CV00254

_____
                    **PLAINTIFF**
                Vs.
PAUL PEREIRA, ALTON GROUP, LLC, ALTON

CONSULTING GROUP, LLC., ALTON GROUP, INC.,

ALTON BIO, LLC, ALTON BIO I, LLC., RACHAEL PEREIRA and
THE HOUSE OF MIAMI, LLC.,
                    **DEFENDANT**

FILED IN OFFICE
2016 May 18 01:55 PM
CECILIA WILLIS
CLERK OF SUPERIOR COURT
DECATUR COUNTY, GEORGIA
2016-119

**SUMMONS**

TO THE ABOVE NAMED DEFENDANT: Rachael Pereira, 1521 Alton Road, Miami Beach, FL 33139

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

Patricia G. Griffith
Leanne C. Mehrman
271 17th Street, N.W., Suite 1900
Atlanta, Georgia 30363
(404) 888-3800

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This \_18th\_ day of \_\_May_____, 2016 .

                    Clerk of ⟨Superior⟩ Court/State Court

            By: \_\_Debbie Harter_____
                            **Deputy Clerk**

SC-1 Rev. 85

**IN THE SUPERIOR/STATE COURT OF** Decatur _____ **COUNTY**

## STATE OF GEORGIA

MEREDIAN HOLDINGS GROUP, INC.,

MEREDIAN, INC. and DANIMER SCIENTIFIC, LLC,

**CIVIL ACTION**
**NUMBER** 16CV00254

FILED IN OFFICE
2016 May 18 01:55 PM
CECILIA WILLIS
CLERK OF SUPERIOR COURT
DECATUR COUNTY, GEORGIA
2016-119

**PLAINTIFF**

Vs.

PAUL PEREIRA, ALTON GROUP, LLC, ALTON

CONSULTING GROUP, LLC., ALTON GROUP, INC.,

ALTON BIO, LLC, ALTON BIO I, LLC., RACHAEL PEREIRA and
THE HOUSE OF MIAMI, LLC.,

**DEFENDANT**

## SUMMONS

**TO THE ABOVE NAMED DEFENDANT:** The House of Miami, LLC, 1521 Alton Road, Miami Beach
FL 33139

You are hereby summoned and required to file with the Clerk of said court and
serve upon the Plaintiff's attorney, whose name and address is:

Patricia G. Griffith
Leanne C. Mehrman
271 17th Street, N.W., Suite 1900
Atlanta, Georgia 30363
(404) 888-3800

an answer to the complaint which is herewith served upon you, within 30 days after
service of this summons upon you, exclusive of the day of service. If you fail to do so,
judgment by default will be taken against you for the relief demanded in the complaint.

This ___18th___ day of ___May___ ,2016 .

Clerk of Superior Court/State Court

By: _Debbie Harter_

**Deputy Clerk**

SC-1 Rev. 85

## SUPERIOR COURT OF DECATUR COUNTY
## STATE OF GEORGIA

```
-------------------------------------------------------------x
MEREDIAN HOLDINGS GROUP, INC.,          :
MEREDIAN, INC. and                      :
DANIMER SCIENTIFIC, LLC                 :        CIVIL ACTION NO. 16 CV00254
                                        :
                                        :        JURY TRIAL DEMANDED
              Plaintiffs,               :
                                        :
     v.                                 :
                                        :
PAUL PEREIRA, ALTON GROUP, LLC.,        :
ALTON CONSULTING GROUP, LLC.,           :
ALTON GROUP, INC., ALTON BIO, LLC.,     :
ALTON BIO I, LLC., RACHAEL PEREIRA,     :
and THE HOUSE OF MIAMI, LLC,            :
                                        :
              Defendants.               :
-------------------------------------------------------------x
```

FILED IN OFFICE
2016 May 18 01:55 PM
CECILIA WILLIS
CLERK OF SUPERIOR COURT
DECATUR COUNTY, GEORGIA
2016-126

## COMPLAINT

Plaintiffs Meredian Holdings Group, Inc. ("Meredian Holdings"), Meredian, Inc. and DaniMer Scientific, LLC ("DaniMer") (collectively, "Meredian" or "Plaintiffs"), by and through their undersigned counsel, file this Complaint for damages and other legal and equitable relief against defendants Paul Pereira ("Pereira"), Alton Group, LLC ("Alton Group"), Alton Consulting Group, LLC ("Alton Consulting"), Alton Group, Inc. ("Alton Inc."), Alton Bio, LLC. ("Alton Bio") and Alton Bio I, LLC. ("Alton Bio I") (collectively, the "Alton Companies"), Rachael Pereira, and The House of Miami, LLC. ("The House of Miami") (collectively, the "Defendants").

419332v2

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over the subject matter of this Complaint pursuant to Article VI, § IV of the Constitution of the State of Georgia (1983), as amended.

2.      This Court has personal jurisdiction over all nonresident Defendants pursuant to O.C.G.A. § 9-10-91 because: (a) the claims asserted herein arise out of business conducted by such defendant in Decatur County Georgia; (b) each such defendant committed tortious acts or omissions within Decatur County, Georgia; and/or (c) each such Defendant committed or caused a tortious injury in Decatur County, Georgia and such defendant regularly conducts business in Decatur county, Georgia and/or derives substantial revenue from goods used or consumed or services rendered in Decatur County.

3.      Venue is proper in Decatur County as the events giving rise to this action occurred in such venue.

## THE PARTIES

4.      At all relevant times, plaintiff Meredian Holdings was and is a corporation duly organized and existing under and by virtue of the laws of the State of Georgia, with its principal place of business located at 140 Industrial Boulevard, Bainbridge, Georgia 39817.

5.      At all relevant times, plaintiff Meredian, Inc. was a corporation duly organized and existing under and by virtue of the laws of the State of Georgia, with its principal place of business located at 140 Industrial Boulevard, Bainbridge, Georgia 39817.

6.      At all relevant times, plaintiff DaniMer was a limited liability company organized and existing under and by virtue of the laws of the State of Georgia, with its principal place of business located at 140 Industrial Boulevard, Bainbridge, Georgia 39817.

419332v2

7.      As part of a restructuring that occurred in or around June 2014, Meredian, Inc.

and DaniMer became wholly-owned subsidiaries of Meredian Holdings, and are collectively

referred to herein as "Meredian" and/or "Plaintiffs."

8.      Upon information and belief, at all relevant times, defendant Pereira is an

individual domiciled and permanently residing in the State of Florida, with an address of 1521

Alton Road, Miami Beach, Florida 33139.

9.      Upon information and belief, at all relevant times, defendant Alton Group was

and is a limited liability company duly organized and existing under and by virtue of the laws of

the State of Florida, with its principal place of business located at 1521 Alton Road, Miami

Beach, Florida 33139.  Upon information and belief, Pereira is the only member of Alton Group,

and its Registered Agent is Rachael Pereira, also located at 1521 Alton Road, Miami Beach,

Florida 33139.

10.      Upon information and belief, at all relevant times, defendant Alton Consulting

was and is a limited liability company duly organized and existing under and by virtue of the

laws of the State of Florida, with its principal place of business located at 1521 Alton Road,

Miami Beach, Florida 33139.  Upon information and belief, Pereira is the only member of Alton

Consulting, and its Registered Agent is Rachael Pereira, also located at 1521 Alton Road, Miami

Beach, Florida 33139.

11.      Upon information and belief, at all relevant times, defendant Alton, Inc. was and

is a corporation duly organized and existing under and by virtue of the laws of Belize, with its

principal place of business located at 1521 Alton Road, Miami Beach, Florida 33139.  Upon

information and belief, Pereira is the only shareholder of Alton, Inc. and its Registered Agent is

Rachael Pereira, also located at 1521 Alton Road, Miami Beach, Florida 33139.

419332v2

12.     Upon information and belief, at all relevant times, defendant Alton Bio was and is a limited liability company duly organized and existing under and by virtue of the laws of the State of Florida, with its principal place of business located at 1521 Alton Road, Miami Beach, Florida 33139.  Upon information and belief, Pereira is the only member of Alton Bio, and its Registered Agent is Rachael Pereira, also located at 1521 Alton Road, Miami Beach, Florida 33139.

13.     Upon information and belief, at all relevant times, defendant Alton Bio I was and is a limited liability company organized and existing under and by virtue of the laws of the State of Florida, with its principal place of business located at 1521 Alton Road, Miami Beach, Florida 33139.  Upon information and belief, Pereira is the only member of Alton Bio I, and its Registered Agent is Rachael Pereira, also located at 1521 Alton Road, Miami Beach, Florida 33139.

14.     Upon information and belief, at all relevant times, defendant Rachael Pereira is an individual domiciled and permanently residing in the State of Florida, with an address of 1521 Alton Road, Miami Beach, Florida 33139.  Upon information and belief, at all relevant times, defendant Rachael Pereira was and is Pereira's wife.

15.     Upon information and belief, at all relevant times, defendant The House of Miami was and is a limited liability company duly organized and existing under and by virtue of the laws of the State of Florida, with a principal place of business located at 1521 Alton Road, Miami Beach, Florida 33139.  Upon information and belief, Pereira and Rachael Pereira are the only members of The House if Miami, and its Registered Agent is Rachael Pereira, also located at 1521 Alton Road, Miami Beach, Florida 33139.

16.     Upon information and belief, at all relevant times, each of the Defendants was and is doing and/or transacting business within the State of Georgia, contracted to supply goods and/or services within the State of Georgia and purposefully engaged in the actions described hereinbelow and which form the basis of Plaintiffs' claims within the State of Georgia and/or causing injury to Plaintiffs within the State of Georgia.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### *The Parties' Initial Negotiations*

17.     Since approximately 2004 and continuing to the present, Meredian has been engaged in the business of manufacturing PHA (polyhydroxyalkanoates) biopolymers using renewable sources, for the purpose of reducing the global dependence on petroleum historically used in the production of plastic.  Meredian currently owns approximately 125 patents related to a range of manufacturing processes and biopolymer formulations to create and manufacture biodegradable plastic.

18.     In or around the summer of 2013, (before Meredian's restructuring), DaniMer and Meredian, Inc. commenced discussions with Pereira concerning the possibility of Pereira becoming the Executive Director of both companies and implementing a "turnaround plan," because the companies were experiencing financial difficulty.  The turnaround plan was to include, without limitation: (a) restructuring and reorganizing the companies; (b) pursuing additional licensing opportunities for the companies' technology; and (c) raising additional capital to complete the construction of a production facility with a production capacity of at least 30 million pounds of PHA bio-based resin annually (the "Turnaround Plan").

19.     During the referenced discussions, which occurred in person at locations within Decatur County, Georgia, including at Meredian's offices, the offices of Dowdy & Whittaker,

419332v2

CPAs, and Southwind Plantation, between and among John Dowdy, Richard Ivey, Ralph Powell, Tim Smith and Greg Calhoun, on behalf of DaniMer and Meredian, Inc., and Pereira, on behalf of himself and the Alton Companies, Pereira touted his education and experience in the corporate and engineering fields, and stated that he had degrees in engineering, chemistry, business and finance, including the following: (a) a Bachelor of Science degree in Mechanical Engineering from Texas A&M University, (b) a Masters degree in Business Administration in International Business and Finance from the University of West Indies; (c) a Bachelor of Science degree in Chemistry from McGill University; and (d) a Doctorate of Business Administration, International Business Strategy, M&A/Capital Markets from St. John's University.

20.     Pereira repeated the foregoing statements about his education and backround in a meeting at Meredian's offices that included Pereira, Phil Van Trump, Scott Tuten, and Michael Smith.  Mssrs. Van Trump and Tuten obtained a copy of Pereira's curriculum vitae on the Alton Group's website, which reflected the each of the foregoing degrees.  Such education and qualifications were consistent with those necessary to complete the Turnaround Plan, particularly the construction of a production facility with the required capacity, and Meredian would not have considered engaging Pereira and/or the Alton Companies in any capacity if he did not possess the education and/or background, as represented.

21.     Based upon Pereira's representations made throughout June and July 3013, concerning his education and experience, both in discussions with the foregoing individuals on behalf of DaniMer and Meredian, Inc., and by Pereira's curriculum vitae published on the Alton Group's website (which was consistent with his verbal representations), DaniMer and Meredian, Inc. proceeded to enter into a series of related agreements with Pereira and/or entities which he controlled, (collectively referred to as the "Alton Agreements"), as set forth below.

419332v2

### *The Memorandum of Understanding*

22.     On or about August 2, 2013, in reliance on Pereira's representations concerning his education and experience, DaniMer and Meredian, Inc. entered into a Memorandum of Understanding (the "MOU") with the Alton Group, whereby DaniMer and Meredian, Inc. agreed to employ Pereira as the Executive Director of both companies for the purpose of implementing the Turnaround Plan and further agreed to retain Alton Group as a consultant with regard to each element of the Turnaround Plan.  A true and correct copy of the MOU is annexed as Exhibit "A" hereto and is expressly incorporated by reference herein.

23.     In exchange for Pereira and/or Alton Group's services pursuant to the MOU, DaniMer and/or Meredian, Inc. agreed to: (a) provide Alton Group with restricted shares in both DaniMer and Meredian, Inc. equal to twenty percent (20%) of the total shares of each entity outstanding after the completion of certain financing, or twenty percent (20%) of Meredian Holdings in the event of the contemplated restructuring; (b) pay Alton Inc. (described in the MOU as a Belize International Business Company), an aggregate fee of $35,000 per month for turnaround consultancy services; (c) pay Alton Group five percent (5%) of any capital infusions, whether debt or equity, received by either DaniMer and/or Meredian, Inc. during the period of Alton Group's engagement provided, however, such capital infusions were not underway prior to Alton Group's engagement; (d) pay Alton Group 2.5 percent of any funds raised via a New Market Tax Credit Transaction during the period of Alton Group's engagement; and (e) pay Alton Group certain net royalties received from any licensing agreements executed with any third party, according to a formula set forth in the MOU.

419332v2

### *The Subscription and Stock Purchase Agreement*

24.     In connection with the provision in the MOU relating to the transfer of restricted shares, on or about March 1, 2014, DaniMer and Meredian, Inc. entered into a Subscription and Stock Purchase Agreement with Alton Bio (another entity owned and controlled by Pereira) (the "Stock Purchase Agreement"), whereby DaniMer and Meredian, Inc. agreed, inter alia, to sell twenty percent (20%) of each company's shares, or twenty percent (20%) of Meredian Holdings in the event of the contemplated restructuring, in exchange for $6,600,000, payable by the delivery of a promissory note.  A true and correct copy of the Stock Purchase Agreement is annexed hereto as Exhibit "B" and is incorporated by reference herein.

25.     Simultaneously with the execution of the Stock Purchase Agreement and pursuant thereto, on or about March 1, 2014, Alton Bio executed and delivered to DaniMer and Meredian, Inc. a promissory note (the "Promissory Note") in the amount of $6,600,000, with simple interest thereon at .28% per year.  The principal balance of the Promissory Note was due to be paid by March 1, 2018.  A true and correct copy of the Promissory Note is annexed hereto as Exhibit "C" and is incorporated by reference herein.

26.     To date, no part of the principal or interest required by the Promissory Note has been paid.

### *The Alton Consulting Group Agreement*

27.     In or around June 2014, DaniMer and Meredian, Inc. became wholly-owned subsidiaries of Meredian Holdings pursuant to a restructuring.

28.     On or about April 25, 2014 (and effective as of January 1, 2014), Meredian Holdings entered into an agreement with Alton Consulting  (another entity owned and controlled by Pereira), whereby Meredian Holdings agreed to employ Pereira as its Executive Chairman

and engage Alton Consulting to further implement the Turnaround Plan referenced in the MOU

(the "Alton Consulting Agreement").  A true and correct copy of the Alton Consulting

Agreement is annexed as Exhibit "D" hereto and is expressly incorporated by reference herein.

29.     In exchange for Pereira and Alton's services pursuant to the Alton Consulting

Agreement, Meredian Holdings agreed to: (a) pay Alton Consulting $50,000 monthly; (b) pay

Alton Consulting five percent (5%) of any capital infusions, whether debt or equity, received by

Meredian Holdings during the period of Alton Group's engagement, up to $100 million (c) pay

Alton Consulting certain net royalties received from any licensing agreements executed with any

third party, according to a formula set forth in the agreement.

30.     The initial term of the Alton Consulting Agreement was three years from the

effective date of January 1, 2014.  Pursuant to Section 6(ii), the Alton Consulting Agreement

could be terminated with cause: "Cause shall include, but shall not be limited to, the following:

Pereira's fraud, substantial and continuous nonperformance of assigned duties, failure to comply

with any reasonable material written policy of Meredian, continuous performance of duties at a

level significantly below the performance level expected from an [sic] contractor in a similar

position and at a similar compensation level within Meredian's industry, unlawful activities

involving moral turpitude for which Pereira is indicted or convicted or pleads guilty or a material

continuing breach of this Agreement by Alton."

### *Deferred Compensation Agreement*

31.     On or about June 15, 2014, Meredian Holdings and Alton Bio entered into an

agreement (the "Deferred Compensation Agreement"), whereby Meredian Holdings agreed to

provide "an unfunded, nonqualified deferred compensation benefit to Alton Bio in the amount

of $6,618,480," in order to serve as an additional incentive to Pereira and/or the entities which

419332v2

he owned and/or controlled to promote the success of Meredian Holdings.  A true and correct copy of the Deferred Compensation Agreement is annexed hereto as Exhibit "E" and is incorporated by reference herein.

### *Incentive Stock Option Agreement*

32.     On or about January 5, 2015, Meredian Holdings and Pereira entered into an Incentive Stock Option Agreement, whereby Meredian Holdings granted certain stock options to Pereira.  Pereira did not exercise any options under this agreement, which has expired by its terms.

### *Pereira and the Alton Companies' Fraud and Malfeasance*

33.     By the spring of 2015, Pereira and/or the Alton Companies had failed to perform their duties under the parties' agreements, including the MOU and the Alton Consulting Agreement.  Despite ample time and opportunity, Pereira and/or the Alton Companies had failed to: (a) pursue licensing opportunities for Meredian's technology; and (b) raise any additional capital or make any progress to complete the construction of Meredian's production facility; and (c) otherwise make meaningful progress toward the completion of the Turnaround Plan.

34.     In addition to the foregoing, by fall of 2015, Meredian suspected and later confirmed that since the inception of the parties' relationship, Pereira and/or the Alton Companies had engaged in a brazen pattern of improper conduct and self-dealing designed to enrich Pereira and/or Alton Companies and which damaged Meredian's business and its relationships with existing and potential customers and investors.  To wit, upon information and belief, Pereira and/or the Alton Companies had engaged in the following conduct, inter alia:

419332v2

(a)     Repeatedly altered and misrepresented Meredian's projections and other company information in presentations and communications to potential customers and/or investors in order to obtain their business under false pretenses;

(b)     Repeatedly and purposefully disclosed confidential information of customers and/or potential customers in press releases and presentations;

(c)     Repeatedly used Meredian funds to reimburse himself and/or the Alton Companies for personal and non-business related expenses by misrepresenting that expense requests were for business purposes.  These included, without limitation, travel expenses for Pereira and his wife that were not business-related, dry cleaning services, dining expenses, boat fuel and fishing equipment;

(d)     Repeatedly wasted company money on non-essential and useless endeavors, including establishing an office in Miami, Florida (which was used by Pereira and/or the Alton Companies for non-Meredian business), hiring personal friends who lacked any relevant experience and brought no value to Meredian, paying for trips abroad for his son and his son's friend, and retaining a marketing firm at an exorbitant rate whose primary purpose was to promote Pereira and/or the Alton Companies, rather than Meredian.  As a result, Meredian was unable to purchase raw materials, equipment and safety items necessary to operate its core business;

(e)     Repeatedly engaged in self-dealing, including retaining and causing substantial fees to be paid to defendant The House of Miami, a company owned and controlled by Pereira and his wife, for graphic design services that were unnecessary and/or exorbitant, and the fees for which went directly to Pereira and his wife;

419332v2

(f)     Repeatedly failing to show up for meetings with potential and current customers and/or investors and/or showing up and/or becoming grossly inebriated; and

(g)     Repeatedly threatening, without basis, to terminate Meredian's executive team when they sought to question his conduct and thereby fomenting disruption, turmoil and uncertainty in the workplace.

35.     During a thorough investigation conducted throughout September and October 2015, Meredian confirmed by substantial evidence each of the allegations set forth in paragraph 34, above.

36.     During Meredian's  investigation of Pereira and/or the Alton Companies, Meredian not only confirmed the acts of gross misconduct and self-dealing alleged above, but discovered critical and material fraudulent misrepresentations and omissions made by Pereira and/or the Alton Companies during the parties' initial discussions.

37.     Contrary to his representations, at no time did Pereira have a Bachelor of Science degree in Mechanical Engineering from Texas A&M University – or anywhere else – nor did he have a Masters in International Business and Finance from the University of West Indies – or anywhere else.

38.     Meredian was not able to substantiate other representations made by Pereira at that time and contained in his curriculum vitae, such as Pereira's representation that he received a "D.B.A. in International Business Strategy, M&A/Capital Markets, International School of Management, Paris France from St. John's University," or that he received a "B.S. in Chemistry from McGill University," because the universities identified either did not have relevant records, or did not provide enough information to confirm such degrees.

419332v2

39.     During the course of its investigation, Meredian also learned that prior to entering into any of the Alton Agreements, Pereira made a deal with one of Meredian's Board members to provide such Board member with a portion of the compensation in the event he and/or the Alton Companies were retained by Meredian in exchange for any influence the Board member could exert to facilitate Pereira and/or the Alton Companies' engagement.

40.     Thus, Pereira and/or the Alton Companies provided the aforesaid Board member with certain cash and shares of Meredian subsequent to their engagement by Meredian.

41.     Pereira did not disclose the "side deal" until September 15, 2015, long after Meredian entered into the Alton Agreements and, even then, misrepresented the timing and nature of the side deal in a further effort to defraud Meredian.

42.     As a result of the foregoing, by letter dated November 3, 2015 and delivered to Pereira, Meredian terminated the Alton Consulting Agreement for cause pursuant to Section 6(ii) thereof and terminated Pereira's employment with Meredian for the reasons set forth therein.  A true and correct copy of Meredian's letter dated November 3, 2015 is annexed hereto as Exhibit "F" and is incorporated by reference herein.

43.     As a further result of the foregoing, and after additional investigation, by letter dated December 23, 2015 and delivered to counsel for Pereira and/or the Alton Companies, Meredian notified Pereira and /or the Alton Companies that it was rescinding all of the Alton Agreements because they were induced by fraud and/or constituted conflicting interest transactions prohibited by state law.  By its letter, Meredian also demanded the return of all shares of its stock and/or stock options held by Pereira and/or any of the Alton Companies as well as all of the cash paid to Pereira and/or any of the Alton Companies, except for an amount

419332v2

representing the limited value of services provided.  A true and correct copy of the letter dated
December 23, 2015 is annexed hereto as Exhibit "G" and is incorporated by reference herein.

44.     To date, Pereira and/or the Alton Companies have failed and refused to return any
of the stock certificates currently in its/their possession, have failed and refused to return any of
the cash paid to it/them since the commencement of the parties' relationship, and, with the
exception of a leased vehicle, has failed and refused to return any company property in his
possession.

## COUNT I:  FRAUD IN THE INDUCEMENT
*(Paul Pereira, The Alton Companies)*

45.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1
through 44 as if more fully set forth herein.

46.     Pereira, acting on behalf of himself and/or the Alton Companies, fraudulently
induced Plaintiffs into entering into the Alton Agreements by making false representations
regarding his education and/or background including, upon information and belief: (a) that
Pereira had a Bachelor of Science degree in Mechanical Engineering from Texas A&M
University; and (b) that Pereira had a Masters in International Business and Finance from the
University of West Indies.

47.     Meredian reasonably believed that with such education and/or background,
Pereira and/or the Alton Companies had the knowledge and experience necessary to fulfil their
duties under the parties' agreements and achieve the Turnaround Plan for Meredian.

48.     Pereira, acting on behalf of himself and/or the Alton Companies, separately
fraudulently induced Plaintiffs into entering into the Alton Agreements by making false
representations by omission by failing to divulge his arrangement with a member of the
Meredian's Board, whereby Periera and/or the Alton Companies delivered a portion of the

419332v2

compensation granted to them by Meredian to a member of the Board in exchange for that Board

Member's assistance in obtaining consulting work for Pereira and/or the Alton Companies.

49.     Pereira and/or the Alton Companies' misrepresentations and/or omissions, as

alleged herein, were material, knowingly false when made, and made with intent to defraud

Plaintiffs.

50.     Meredian justifiably and reasonably relied on Pereira and/or the Alton

Companies' misrepresentations by entering into all of the Alton Agreements.

51.      Upon learning of Pereira and/or the Alton Companies' fraud, Plaintiffs promptly

notified them that Plaintiffs were rescinding the Alton Agreements.

52.     Because the substantial amount of cash that Plaintiffs paid to Pereira and/or the

Alton Companies under the Alton Agreements grossly exceeds the value that Pereira and/or the

Alton Companies conferred upon Plaintiffs, Plaintiffs did not make an offer of tender, and

instead permitted Pereira to retain an amount of cash for the value of services performed.

53.      By reason of Pereira's and/or the Alton Group's fraud and Plaintiffs' subsequent

rescission, as described herein, Plaintiffs are entitled to the return of all monies and other

consideration paid or provided to Pereira and/or the Alton Companies, including the return of all

of its stock and/or stock options provided, all company property, as well as any other damages to

be determined at trial, but not less than $15,000,000, plus interest.

## COUNT II:  NEGLIGENT MISREPRESENTATION
*(Paul Pereira and The Alton Companies)*

54.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1

through 53 as if more fully set forth herein.

55.      Pereira and/or the Alton Companies made negligent misrepresentations to

Plaintiffs by representing to Meredian and making available on the Alton Consulting website

419332v2

Pereira's curriculum vitae that falsely stated that Pereira had: (a) a Bachelor of Science degree in Mechanical Engineering from Texas A&M University; and (b) a Masters degree in International Business and Finance from the University of West Indies.

56.     Pereira, acting on behalf of himself and/or the Alton Companies, made negligent misrepresentations by omission by failing to divulge his arrangement with a member of the Meredian's Board, whereby Pereira and/or the Alton Companies delivered a portion of the compensation granted to them by Meredian to a member of the Board in exchange for that Board Member's assistance in obtaining consulting work for Pereira and/or the Alton Companies.

57.     It was foreseeable that Plaintiffs would rely on the foregoing misrepresentations, made during discussions in which Plaintiffs had expressed their intention to engage Pereira and/or the Alton Companies to provide consulting services.

58.     As a direct and proximate result of the foregoing negligent representations, Plaintiffs have been injured and are entitled to recover damages in an amount to be proven at trial, but not less than $15,000,000, plus interest.

## COUNT III:  BREACH OF FIDUCIARY DUTY OF CARE AND GOOD FAITH
### *(Paul Pereira)*

59.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 58 as if more fully set forth herein.

60.     Under Georgia common law and O.C.G.A. §§ 14-2-830 and 14-2-842, Pereira, as Plaintiffs' Executive Chairman and Director, owed fiduciary duties to Plaintiffs and their shareholders, including the duty of good faith and the duty of care of an ordinarily prudent person.

61.     By reason of such duties, Pereira was required to, inter alia, exercise his authority to control and manage Plaintiffs in a fair, just and equitable manner; act in furtherance of the best

419332v2

interests of Plaintiffs and all of their shareholders; act in a manner designed to maximize

shareholder value; refrain from favoring his own interest, or the interest of other companies he

was affiliated with, at the expense and to the detriment of Plaintiffs.

62.     Pereira has knowingly and recklessly committed a gross breach of his fiduciary

duties by engaging in the conduct alleged herein, including, without limitation:

> a.     taking action on Plaintiffs' behalf without proper authority;
>
> b.     wasting Plaintiffs' assets;
>
> c.     mismanaging Plaintiffs and preventing its/their officers from carrying out

their duties;

> d.     acting in a manner anathema to the best interest of Plaintiffs and

inconsistent with the care that an ordinarily prudent person in a like position would exercise

under similar circumstances;

> e.     using corporate assets for personal use;
>
> f.     converting property for himself that rightfully belonged to one or more

Plaintiffs;

> g.     engaging in self-dealing, including, without limitation, by using corporate

assets for personal use;

> h.     placing Plaintiffs at risk by engaging in dishonest behavior with respect to

current and potential customers and investors;

> i.     failing to disclose an arrangement whereby Pereira and/or the Alton

Companies delivered a portion of the compensation received by Plaintiffs to a member of the

Board in exchange for that Board Member's assistance in obtaining consulting work; and

419332v2

j.      failing to disclose the misrepresentations concerning Pereira's education and background that Plaintiffs relied upon in entering into and continuing their relationship with Pereira and/or the Alton Companies.

63.     As a direct and proximate result of Pereira's breaches of his fiduciary duties, Plaintiffs have been injured and are entitled to recover damages from Pereira in an amount to be proven at trial, plus interest.

## COUNT IV:  BREACH OF FIDUCIARY DUTIES RELATED TO CONFLICTING INTEREST TRANSACTIONS
### *(Paul Pereira)*

64.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 63 as if more fully set forth herein.

65.     Under Georgia common law and O.C.G.A. §§ 14-2-860 *et seq.*, Pereira owed fiduciary duties to Plaintiffs and their shareholders, including a duty to refrain from entering into "conflicting interest" transactions without satisfying the requirements of O.C.G.A. § 14-2-864.

66.     Nonetheless, Pereira entered into conflicting interest transactions as defined by O.C.G.A. § 14-2-860 by, inter alia, causing Plaintiffs to enter into transactions for marketing services with The House of Miami, owned by Pereira and his wife, Rachael.

67.     Pereira caused Plaintiffs to enter into these transactions without seeking the approval required for conflicting interest transactions by O.C.G.A. §§ 14-2-862, 14-2-864.

68.     By reason of the foregoing, Pereira violated common law and his statutory fiduciary duties.

69.     The transactions with The House of Miami were not fair to Plaintiffs and, thus, should be set aside.

419332v2

70.     As a direct and proximate result of these breaches, Plaintiffs have been injured and is entitled to recover damages from Paul in an amount to be proven at trial, plus interest.

**COUNT V:  AIDING AND ABETTING BREACH OF<br>FIDUCIARY DUTIES**<br>*(Paul Pereira, The Alton Companies)*

71.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 70 as if more fully set forth herein.

72.     A Board Member of Plaintiffs breached his fiduciary duties owed to Plaintiffs when he agreed to assist Pereira and/or the Alton Companies obtain consulting work in exchange for Pereira and/or the Alton Companies' promise to give a portion of the compensation granted to them by Plaintiffs.

73.     Pereira and/or the Alton Companies, by entering into, performing, and failing to disclose that arrangement, procured the Board Member's breach of his fiduciary duties.  Pereira and/or the Alton Companies acted wrongfully and without privilege in procuring that breach. Further, Pereira and/or the Alton Companies knew that the Board Member owed Plaintiffs a fiduciary duty and acted purposely, with malice and with intent to injure Plaintiffs.

74.     The Alton Agreements therefore constitute conflicting interest transactions as defined by O.C.G.A. § 14-2-860, in light of the Board Member's undisclosed financial interest in the Alton Agreements.

75.     Neither the Board member, nor Pereira, nor the Alton Companies obtained the approval required for conflicting interest transactions by O.C.G.A. § 14-2-862.

76.     The Alton Agreements were not fair to Plaintiffs and, thus, should be set aside.

77.     As a direct and proximate result of Pereira and/or the Alton Companies' aiding and abetting the Board Member's breach of fiduciary duties, Plaintiffs have been injured and is

entitled to recover damages in an amount to be proven at trial and to the return of all of its stock

and/or stock options held by Pereira and/or the Alton Companies in an amount to be determined

at trial, plus interest.

## COUNT VI:  AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES
*(Rachael Pereira, The House of Miami, and the Alton Companies)*

78.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1

through 77 as if more fully set forth herein.

79.     Rachael Pereira, The House of Miami and the Alton Companies procured

Pereira's breaches of his fiduciary duties, as set forth above.  In so doing, they each acted

wrongfully in that they knew Pereira owed Plaintiffs fiduciary duties and acted purposely and

with wanton disregard and malice, and without privilege, by procuring the breaches of Peirera's

fiduciary duties to Plaintiffs with the specific intent to cause injury to Plaintiffs.

80.     As a direct and proximate result of Rachael Pereira, The House of Miami and/or

the Alton Companies' aiding and abetting Pereira's breaches of fiduciary duties, Plaintiffs have

been injured and are entitled to recover damages from them in an amount to be proven at trial,

plus interest.

## COUNT VII:  FRAUD AND CONSPIRACY
*(Paul Pereira, Rachael Pereira, and The House of Miami)*

81.     Plaintiffs repeat and reallege each and every allegation contain in paragraphs 1

through 80 as if more fully set forth herein.

82.     Upon information and belief, the invoices submitted by Rachael Pereira and The

House of Miami to Meredian from October 2014 through August 2015 for payment for

marketing services allegedly rendered on behalf of Plaintiffs contained material

misrepresentations of fact regarding the amount of time spent on projects and/or fees incurred.

419332v2

By way of example only, Rachael Pereira and/or The House of Miami submitted the following invoices:

        a.      February 4, 2015 invoice included fifteen hours to assemble and create January 2015 newsletter, of which five hours were for fixing "typos in Paul's [one and a quarter page] article;"

        b:      July 27, 2015 invoice included three and a half hours to "communicate[] with Paul with the progress of arrangements within the office.  The tasks that are ongoing and the tasks that are completed in preparation (sic) for next week meeting."

83.     Rachael Pereira and The House of Miami willfully and knowingly submitted to Plaintiffs invoices that contained material misrepresentations regarding the amount of time spent on projects and/or the amount of fees due, and acted with the intent to deceive and to induce Plaintiffs to rely on such material misrepresentations and pay for services that were not rendered, or did not take as much time as reflected on the invoices.

84.     Plaintiffs justifiably relied on the false statements of material fact contained in the invoices that Rachael Pereira and The House of Miami made and caused to be made to Plaintiffs.

85.     Paul Pereira conspired in the fraud by advising and causing Plaintiffs to pay to Rachael Pereira and The House of Miami the amounts invoiced, despite knowing that the invoices contained material misrepresentations and gross overstatements of time spent and fees incurred.

86.     Paul Pereira, Rachael Pereira and The House of Miami's commission of fraud and conspiracy to commit fraud, as described herein, entitles Plaintiffs to recover damages from them in an amount to be proven at trial, plus interest.

## COUNT VIII:  FRAUD AND CONSPIRACY
*(Paul Pereira, Rachael Pereira, Alton Consulting, and The House of Miami)*

87.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 86 as if more fully set forth herein.

88.    From October 2014 to August 2015, Paul Pereira, Rachael Pereira, Alton Consulting and The House of Miami submitted to Plaintiffs requests for reimbursement for personal expenses, despite knowing that only business expenses were reimbursable. By way of example only:

   a.    January 29, 2015 receipt for Smith & Wollensky in the amount of $860.00;

   b.    March 31, 2015 charge for JW Marriott in the amount of $498.88 for a conference that Pereira did not attend;

   c.    May 7, 2015 to May 16, 2015 receipt for Armani that contained numerous excessive in room dining and alcohol expenses, as well as laundry expenses for a woman's trousers and jogging suit;

   d.    May 25, 2015 receipt for Ritz-Carlton Buckhead in the name of Charles Pereira;

   e.    May 27, 2015 to May 28, 2015 two separate receipts for same night at Intercontinental;

   f.    July 2015 first class plane ticket for Rachel Pereira in the amount of $4,465.90; and

   g.    Recurrently parking in short-term parking at airport when traveling for more than one day.

89.    A copy of such requests for reimbursement are annexed hereto as Exhibit "I" and are incorporated by reference herein.

419332v2

90.     Paul Pereira, Rachael Pereira, The House of Miami and/or Alton Consulting knowingly and intentionally made and caused to be made misrepresentations of fact and/or material omissions of fact, as reflected in the requests for reimbursement.  They acted with the intent to deceive and induce Plaintiffs into compensating them for their personal expenses.

91.     Each and every request for reimbursement to Plaintiffs that was for a personal expense constituted a material misrepresentation of fact and/or material omission of fact.

92.     Plaintiffs justifiably relied on the false statements of material fact and omissions of material fact that Paul Pereira, Rachael Pereira, Alton Consulting, and The House of Miami made and caused to be made to Plaintiffs.

93.     Paul Pereira, Rachael Pereira, Alton Consulting, and The House of Miami conspired in the fraud alleged herein by concealing the fraud from Plaintiffs and by utilizing the proceeds for their personal use.

94.     Such defendants' commission of fraud and conspiracy to commit fraud, as described herein, entitles Plaintiffs to recover damages from them in an amount to be proven at trial, plus interest.

## COUNT IX:  GEORGIA RICO, O.C.G.A. § 16-14-4(a)
### (All Defendants)

95.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 94 as if more fully set forth herein.

96.     Each defendant is a person within the meaning of O.C.G.A. § 16-14-4.

97.     Defendants, acting in concert to defraud Plaintiffs, are an enterprise within the meaning of O.C.G.A. § 16-14-3(3).

98.     Defendants violated the Georgia Racketeer Influenced and Corrupt Organizations Act ("Georgia Rico"), O.C.G.A. § 16-14-4(a) by acquiring and maintaining an interest in or

419332v2

control of the enterprise and personal property, including Plaintiffs' stock and money, by engaging in a systematic and ongoing pattern of racketeering activity, including theft by deception, O.C.G.A. § 16-8-3, and wire fraud, 18 U.S.C. § 1343.  These crimes were committed to exact large sums of money from Plaintiffs for Defendants' pecuniary gain.

99.     Defendants obtained the property of Plaintiffs by deceitful means and artful practices, with the intention of depriving Plaintiffs of their property.  Defendants theft by deception was committed by, without limitation:

a.     Pereira creating or confirming Plaintiffs' and its customers' and investors' impressions of his educational background and experience, which were false, and which Pereira knew to be false, by placing a fraudulent curriculum vitae on the Alton Consulting website and sending that curriculum vitae or false information from that curriculum vitae both to Plaintiffs' current and potential customers and investors and internally within Meredian;

b.     Pereira failing to correct false impressions of his education background, which Paul had previously created or confirmed;

c.     Pereira and Alton Consulting promising performance of services, which they did not intend to perform and knew would not be performed;

d.     Pereira, Rachael Pereira, Alton Consulting, and The House of Miami creating or confirming Plaintiffs' impression that requests for reimbursement were for legitimate business expenses, as opposed to personal expenses or other illegitimate expenses.

100.     Defendants committed wire fraud by intentionally participating in a scheme to defraud Plaintiffs of money and stock by engaging in the conduct described above.

419332v2

101.    Each of the aforesaid acts of racketeering activity by Defendants were interrelated, were part of a continuous pattern of fraudulent acts and schemes, were perpetrated for similar purposes, and were not a series of disconnected, isolated, or sporadic acts.

102.    As a direct and proximate result of Defendants' acts, Plaintiffs have been injured and are entitled to recover from Defendants three times the actual damages sustained and punitive damages in an amount to be determined at trial, as well as the return of all of its stock and/or stock options held by Paul or one of the companies that he controls in an amount to be determined at trial, plus interest.

### COUNT X:  GEORGIA RICO, O.C.G.A. § 16-14-4(b)
*(All Defendants)*

103.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 102 as if more fully set forth herein.

104.    Defendants violated O.C.G.A. § 16-14-4(b) by conducting or participating in, directly or indirectly, the enterprise through the pattern of racketeering activity set forth above.

105.    As a direct and proximate result of Defendants' acts, Plaintiffs have been injured and are entitled to recover from Defendants three times the actual damages sustained and punitive damages in an amount to be determined at trial, as well as the return of all of its stock and/or stock options held by Paul or one of the companies that he controls.

### COUNT XI:  GEORGIA RICO – CONSPIRACY, O.C.G.A. § 16-14-4(c)
*(All Defendants)*

106.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 105 as if more fully set forth herein.

107.    In committing the acts of theft by deception, outlined above, Defendants conspired to violate and endeavored to violate the provisions of O.C.G.A. § 16-14-4(a).  By

419332v2

committing the above acts of deception, Defendants committed overt acts to effectuate the object of the conspiracy.

108.    As a direct and proximate result of Defendants' acts, Plaintiffs have been injured and are entitled to recover from Defendants three times the actual damages sustained and punitive damages in an amount to be determined at trial, as well as the return of all of its stock and/or stock options held by Paul or one of the companies that he controls.

## COUNT XII:  CONVERSION
### *(All Defendants)*

109.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 108 as if more fully set forth herein.

110.     Defendants' knowingly converted Plaintiffs' funds, stock and property, knowing that they obtained the same by false, fraudulent and improper means, as set forth above.

111.     Moreover, upon the termination of the Alton Consulting Agreement and the rescission of all Alton Agreements, Plaintiffs requested that Pereira and/or the Alton Companies return all company property, including, but not limited to, computers, cell phones, and other personal digital assistants (PDAs).

112.     Defendants have failed and refused to return Plaintiffs' funds, stock and property, despite due demands therefor.

113.     Defendants' acts of conversion described herein entitle Plaintiffs to recover damages from them in an amount to be proven at trial, plus interest.

## COUNT XIII:  UNJUST ENRICHMENT AND MONEY HAD AND RECEIVED
### *(All Defendants)*

114.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 113 as if more fully set forth herein.

419332v2

115.     By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Plaintiffs, and in equity and good conscience, Defendants are not entitled to retain this money.

116.     Plaintiffs seek restitution from Defendants and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct.

## COUNT XIV:  CONSTRUCTIVE TRUST
*(All Defendants)*

117.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 116 as if more fully set forth herein.

118.     Defendants, through their own malfeasance, have obtained funds and property which do not rightfully belong to them.

119.     Defendants are not, in equity and good conscience, entitled to hold and enjoy the beneficial interest from the funds and property, or the funds derived or to be derived from the ownership, development, management, sale, refinancing or other use of the funds and property, in light of their wrongful actions.

120.     This Court should find that Defendants hold the property for the benefit of Plaintiffs during the pendency of this litigation and that Plaintiffs are entitled to an order establishing a constructive trust and an entry of judgment: (a) requiring Defendants to return to Plaintiffs any property or funds it wrongfully took and/or retained; and (b) requiring Defendants to return any funds derived from the ownership, development, management, sale, refinancing, or other use of the property and funds.

419332v2

## COUNT XV:  ACCOUNTING
*(All Defendants)*

121.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 120 as if more fully set forth herein.

122.   Defendants should be required to account to Plaintiffs for all profits realized by their wrongful acts.

123.   Defendants' conduct constitutes grounds for an equitable accounting to Plaintiffs by each Defendant for all wrongfully received benefits, consideration, and profits paid or received.

## COUNT XVI: PUNITIVE DAMAGES
*(All Defendants)*

124.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 123 as if more fully set forth herein.

125.   The actions of the Defendants show willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences.

126.   The Defendants acted with the specific intent to cause harm.

127.   Plaintiffs are entitled to an award of punitive damages against the Defendants, determined by the enlightened conscience of the jury, in an amount sufficient to deter, penalize, and punish the Defendants in light of the circumstances of this case, as provided in O.C.G.A. § 51-12-5.1, and other applicable law.

## COUNT XVII: ATTORNEY'S FEES
*(All Defendants)*

128.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 127 as if more fully set forth herein.

419332v2

129.    The Defendants have acted in bad faith in committing the acts described herein and have caused Plaintiffs unnecessary trouble and expense, as provided in O.C.G.A. § 13-6-11, thereby entitling Plaintiffs to an award of its reasonable expenses of litigation, including attorney's fees.

## COUNT XVIII:  INJUNCTIVE RELIEF
*(All Defendants)*

130.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 129 as if more fully set forth herein

131.    By virtue of Defendants' unlawful conduct, Pereira and/or the Alton Companies now possess and/or control a portion of Meredian Holdings' shares and/or stock options.  The Court should enjoin Pereira and/or the Alton Companies from selling or otherwise transferring any of Meredian Holdings' shares and/or stock options to another.  The transfer of Meredian Holdings' shares and/or stock options currently possessed or controlled by Pereira and/or the Alton Companies will cause Meredian Holdings to suffer immediate and irreparable loss, damage, and injury for which Meredian Holdings will have no adequate remedy at law.

132.    Wherefore Meredian Holdings prays that Pereira and/or The Alton Companies, and those acting in concert with them, be temporarily, preliminarily, and permanently enjoined and restrained from selling or otherwise transferring Meredian Holdings' shares and/or stock options in Pereira and/or the Alton Companies' possession or control to another.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that, after due proceedings, the Court:

a.      Award and grant Plaintiffs compensatory damages with interest therein;

b.      Award Meredian Holdings its shares and/or stock options held by Pereira and/or the Alton Companies and/or the companies he controls;

c.      Award Plaintiffs pre- and post- judgment interest;

d.      Award restitution from Defendants and order disgorgement of all profits, benefits, and other compensation wrongfully obtained by Defendants;

e.      Impose a constructive trust on Defendants' assets;

f.      Order an equitable accounting;

g.      Award Plaintiffs punitive damages;

h.      Award Plaintiffs attorney's fees and costs of suit;

i.      Award Plaintiffs temporary, preliminary, and permanent injunctive relief by enjoining and restraining Defendants and those acting in concert with them from selling or otherwise transferring Meredian Holdings' shares and/or stock options in Pereira and/or The Alton Companies' possession or control to another; and

j.      Award such other and further relief as this Court deems mete and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial.

[SIGNATURE BLOCK ON NEXT PAGE]

419332v2

Respectfully submitted this 17th day of May, 2016.

Patricia G. Griffith
Georgia Bar No. 311928
pgriffith@fordharrison.com
Leanne C. Mehrman
Georgia Bar No. 312910
lmehrman@fordharrison.com

FORD & HARRISON LLP
271 17th Street N.W., Suite 1900
Atlanta, GA  30363
Telephone: (404) 888-3800
Facsimile: (404) 888-3863

Dana M. Susman
New York Bar No. # 2694941
dsusman@kanekessler.com
Jonathan M. Sabin
New York Bar No. 4873477
jsabin@kanekessler.com
*Pro Hac Motions to be Filed*

KANE KESSLER, P.C.
1350 Avenue of the Americas
New York, New York 10019
Telephone: (212) 519-5136
Facsimile: (212) 245-3009

Attorneys for Plaintiffs

419332v2

# EXHIBIT A

### ALTON GROUP – DANIMER/Meredian MOU

This Memorandum of Understanding (MOU) outlines

the intent of an agreement among THE ALTON GROUP, LLC, a Florida limited liability company ("Alton"), DANIMER SCIENTIFIC, L.L.C., a Georgia Limited Liability Company ("DaniMer"), and MEREDIAN, INC., a Georgia Corporation ("Meredian") (DaniMer and Meredian collectively, the "Companies"), and is entered into and effective as of August 2, 2013 (the "Effective Date").

The Companies are affiliated, are having financial difficulty, and face the prospect of insolvency. To address these challenges, the Companies' boards have initiated a round of equity financing prior to the effective date of this MOU (the "Board Financing Round") and intend to implement a turnaround plan.

Paul Pereira ("Pereira") will be appointed as Executive Director of both Companies with direct reporting responsibility to the Board of Directors of both Companies to implement a turnaround plan that involves: (i) restructuring and reorganizing the Companies (ii) pursuing additional licensing opportunities for Companies' technology, and (iii) raising of additional capital to complete the construction of a Meredian production facility with a production capacity of at least 30 million pounds of PHA resin annually (the "Meredian Facility") as well as the completion of items (i) and (ii) above. Pereira is the principal Member of Alton. Alton will act as a consultant with regard to each element in the turnaround plan and will contribute a minimum of two weeks per month of Paul Pereira's time to accomplish the turnaround plan.

Alton will receive restricted shares in both DaniMer and Meredian equal to 20 percent of the total shares of each entity outstanding after the completion of the Board Financing Round (the "Equity Grant"). If DaniMer and Meredian restructure, reorganize, merge or otherwise combine into one entity, as is contemplated by the Companies and Alton, the Equity Grant shall be exchanged for an equity interest in the successor entity using an exchange ratio that will maintain Alton's equity ownership in the business at the same level as it was immediately before such restructuring, reorganization or merger. Any references to the Equity Grant hereunder shall also refer to any equity interest issued to Alton in the successor entity in exchange for the Equity Grant as the result of such restructuring, reorganization or merger.

The Companies may need to obtain third party consents to undertake the Equity Grant as contemplated, and the Companies will use their best efforts to obtain any needed third party consents.

It is the intent of Alton and the Companies to secure all capital needed to complete the turnaround plan including completion of the Meredian Facility by issuing shares in both DaniMer and Meredian equal to not more than 40 percent of the total shares of each entity outstanding immediately after the completion of the Board Financing Round (the "Turnaround Equity Limit"), including the Equity Grant. Any and all capital needed to accomplish the turnaround plan, is expected to require the issuance of no more than 20 percent of shares outstanding in each of DaniMer and Meredian after the completion of the Board Financing

1

Round to third party investors beyond the Equity Grant. It is understood by Alton and the Companies that Alton may be required to give up a portion of its Equity Grant to satisfy a transaction with an external investor so as to not exceed the Turnaround Equity Limit. Alton will return to the Companies any portion of the Equity Grant that is required to ensure the Turnaround Equity Limit is not exceeded.

Alton agrees to a 12 month objective for raising sufficient capital to implement the turnaround plan. If sufficient capital for the turnaround plan has not been raised within 12 months of the date of this Agreement, for reasons other than (i) the Companies' delay for causes outside the reasonable control of Alton or Pereira or (ii) external regulatory or non regulatory delays outside the reasonable control of Alton or Pereira, then 75% of the Equity Grant shall be cancelled and returned to each of the Companies or to the successor . In the event of this occurrence, the remaining equity ownership of Alton in the Companies or the successor to the Companies would not exceed 5 percent of the total equity of the Companies or the successor.

During the Term of this Agreement, the Companies shall pay Alton Group, Inc., a Belize International Business Company, an aggregate fee of $35,000 per month for turnaround consultancy services.

Companies will pay Alton five percent (5%), of any capital infusions, whether debt or equity, received by the Companies during the period of Alton's engagement by the Companies. This commission shall apply to all capital infusions regardless of whether the investors making such infusions were introduced to Companies through Alton. Alton will not be paid commission on capital infusions for which actions were underway prior to engagement of Alton including capital that has been committed to in the Board Financing Round as of the date of this MOU. The Companies will pay Alton 2.5 percent of any funds raised via a New Market Tax Credit Transaction during the period of Alton's engagement by the Companies.

The Companies will pay Alton four percent (4%) of net royalties received from any licensing agreements executed with any third party during the three year period commencing on the effective date of this MOU for a period of the first five years from the date of the licensing agreement, three percent (3%) for the same licensing agreements for the subsequent five year period and two percent (2%) for the same license agreements for the remainder of the license agreement. The above fees shall be charged on net royalties received from any and all licensing agreements entered into by the Companies or their successor(s) during the Term of this Agreement regardless of whether the licensee was introduced to Companies by Alton. No such fees shall be paid to Alton on licensing agreements entered into by the Companies or their successor(s) after the termination of the three year period commencing on the effective date of this MOU.

The initial term of this Agreement shall be twelve months beginning on the effective date. The Companies, or any successor entity, and Alton may renew this Agreement for successive periods by mutual agreement. Successive periods can be any length of time mutually agreed. Together, the initial term and successive terms, if any, are, for purposes of this MOU, referred to as the "Term".

2



The Companies have the right to terminate this Agreement upon 90 days written notice and cancel 75 percent of the Equity Grant if any of the following objectives are not met within the stipulated timeframe for reason other than (i) companies' delay for causes outside the reasonable control of Alton or Pereira or (ii) external regulatory or non regulatory delays outside the reasonable control of Alton or Pereira.

1. Within the first 180 days of the Effective Date, Companies must be paid or have signed commitments for additional equity or debt infusions of at least Five Million US Dollars ($5,000,000.00), the terms of which must be approved by the Companies' Board, in addition to funds raised in the Board Financing Round and ½ of New Market Tax Credit Transaction net proceeds.

2. Within the first 180 days of the Effective Date, DaniMer and Meredian must have been reorganized, restructured, merged or otherwise combined in a manner approved by the Companies Board so as to result in a single surviving entity; or a holding company owning a 100% equity interest in the Companies.

3. Within the first 12 months of the Effective Date, the Companies or any successor entity must have raised sufficient capital to fund completion of the Meredian Facility.

The Companies will reimburse Alton for reasonable expenses with an agreed upon maximum incurred for local accommodation and transport expenses for Paul Pereira and for two return air travel tickets from Company's headquarters (or nearest airport) to Miami, Florida per month. In all cases, such expenses will be reimbursed only upon presentation of appropriate documentation to substantiate such expenses pursuant to the Companies' guidelines governing reimbursement of expenses. The Companies' Financial committees may also approve other expenses requested, so long as the request is received in advance of the expenditure.

Alton and Paul Pereira agree to execute and be bound by the terms and conditions of a non-compete agreement that also provides for non-disclosure of trade secrets and other confidential information, and non-circumvention of any business of the Companies.

Alton is not a broker-dealer and does not hold itself out as such. To the extent Alton is paid for capital infusions of the Company, it is for consultations regarding implementation of the various elements of the Companies' turnaround plan. To the extent Alton may deal with third party investors, it will be solely to introduce the potential investor to Companies. Alton shall not negotiate on behalf of Companies or any successor entity, offer any specifics regarding investments in Companies or any successor entity or offer any investment advice to third party investors.

This MOU is a statement of the present intentions of the parties and shall be superceded by a contract to be signed within 30 days of the effective date of this MOU but after completion of ongoing background checks. The terms of any contract signed by the parties shall be in full compliance with all applicable state and federal laws and regulations. This MOU shall expire at 5:00 PM US Eastern time on September 15, 2013, if not executed by the parties by such date.

3

IN WITNESS WHEREOF, the parties hereto have executed this MOU as of the date first above written.

DANIMER SCIENTIFIC, L.L.C.

By: _____
Name: _Daniel Callaway_
Title: _CEO_

MEREDIAN BIOPLASTICS, INC.

By: _____
Name: _Daniel Callaway_
Title: _CEO_

THE ALTON GROUP, LLC

By: _____
Name: _Paul Pereira_
Title: _Principle_

4

# EXHIBIT B

# Subscription and Stock Purchase Agreement

**This STOCK PURCHASE AGREEMENT** (the "Agreement") is made and entered into on March 1, 2014, by and between MEREDIAN, INC. ("Meredian"), and DANIMER SCIENTIFIC, L.L.C. ("DaniMer"), (together, Meredian and DaniMer may be referred to herein as the "Sellers") and ALTON BIO, LLC ("Purchaser") (Sellers and Purchaser may be referred to herein as the "parties" to this Agreement).

## Recitals

WHEREAS, on or about February 19, 2014, Meredian's shareholders and DaniMer's members approved a reorganization and merger transaction (the "Merger") whereby a successor entity will be formed with all of the assets and liabilities of both Meredian and DaniMer pending approval from Sellers' lenders;

WHEREAS, Sellers desires to sell, and Purchaser desires to subscribe to 20% of the issued and outstanding shares of Meredian and DaniMer or, in the event the planned Merger is consummated, the Sellers' successor entity(ies) in the Merger;

THEREFORE, in consideration of those Recitals, the mutual promises, covenants and conditions set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

## Article I  Purchase and Sale of Stock

**1.      Sale of Purchased Shares**

Subject to the terms and conditions set forth in this Agreement, Sellers agree to issue, assign, transfer, sell, convey and deliver to Purchaser and Purchaser hereby subscribes for and accepts a 20% equity interest in Meredian and a 20% equity interest in DaniMer or any successor entity(ies), including the successor entity of the anticipated Merger (the "Purchased Equity Interests") as of March 1, 2014 ("the Purchase Effective Date") subject to the non-dilution provisions of Section 3, below.

In consideration of the shares, Purchaser shall pay to Sellers, or any successor entity, Six Million, Six Hundred Thousand and 00/100 Dollars ($6,600,000.00) (the "Purchase Price"), which the parties agree is the fair market value of the Purchased Equity Interests as of the Purchase Effective Date.

**2.      Title to Stock**

Except as otherwise expressly provided herein, the Equity Interest shall be transferred to Purchaser by issuance of shares of Meredian and units of DaniMer or shares or units of any successor entity, including the successor entity of the anticipated Merger, within six (6) months of the Purchase Effective Date, free and clear of all liens, liabilities, claims, security interests, mortgages, pledges, agreements, obligations, restrictions, or other encumbrances of any nature whatsoever, whether absolute, legal, equitable, accrued, contingent or otherwise. Sellers, or any successor entity, shall present share and unit certificate(s) evidencing the Equity Interests in Meredian and DaniMer or their successor entity(ies) with all necessary endorsements within 6 months of the execution of this Agreement.

3.    **Anti-Dilution**

The Sellers hereby agree with Purchaser that to the extent the Sellers or any successor entity of Sellers issue any equity securities prior to the earlier of (i) the date the Sellers or their successor entity(ies) raise an aggregate of at least $25,000,000 in additional capital, in one or more transactions, on or after the effective date of the Merger if and when it is consummated or, if not consummated, then the effective date of this Agreement and (ii) the date immediately prior to the date that shares or units of Meredian or DaniMer, or the shares or units of any successor entity are listed for trading on a national, regional or other principal stock exchange or are quoted on an automated quotation system (including the OTC Bulletin Board) (such newly issued equity securities, "Dilutive Securities") the Sellers or their successor entity(ies) shall also issue, without any further consideration to or from the Purchaser, such number of shares or units of Meredian, DaniMer, or their successor entity(ies)  (a "Gross-Up") as shall be necessary so that following such Gross-Up issuance the Non-Dilutive Shares or units plus all Gross-Up issuances then issued to the Purchaser shall represent (as precisely as possible to the nearest whole share) the same percentage of the issued and outstanding capital stock of Meredian and DaniMer or their successor entity(ies)  immediately following the issuance of the Dilutive Securities as the Non-Dilutive Shares, together with all Gross-Up issuances issued prior to the most recent Gross-Up issuance,  represented prior to the issuance of Dilutive Securities giving rise to the most recent Gross-Up Issuance.

4.    **Payment Terms**

The purchase price shall be payable by a delivery of a promissory note in the principal amount of the Purchase Price, executed by Purchaser and delivered to Sellers simultaneously herewith, substantially in the form attached hereto as Exhibit A.  The promissory note shall bear simple interest at the rate of .28% per year.  Interest shall be payable annually and the principal balance shall be payable in one (1) installment on March 1, 2018.

5.    **Merger Savings Clause**

It In the event of consummation of the anticipated Merger, Sellers shall take all actions necessary to ensure that the provisions of this Agreement are carried in full force and effect and that Purchaser is granted its full 20% Equity Interest in any successor entity that results from a Merger of Meredian and DaniMer.

6.    **Nontransferability**

Purchaser's rights under this Agreement may not be transferred.  More particularly (but without limiting the generality of the foregoing), the right to purchase any Purchased Equity Interests under this Agreement may not be assigned, transferred, pledged, or hypothecated in any way, shall not be assignable by operation of law, and shall not be subject to execution, attachment or similar process.  Any attempted assignment, transfer, pledge, hypothecation, or other disposition contrary to the provisions hereof, and the levy of any execution, attachment, or similar process, will be null and void and without effect.

## Article II Representations

1.    **Corporation's Representations**

Sellers hereby represent and warrant to Purchaser with respect to the shares and units being sold by them that:

a.   Sellers have the power and authority to enter into this Agreement and to perform its terms.

b.   The transfer of the Purchased Equity Interests pursuant to the terms of this Agreement will be free and clear of any and all debts, security interests, liens and encumbrances of whatsoever kind or nature, except as otherwise expressly provided herein, and does not violate any restrictions imposed by any such debts, security interests, liens and encumbrances.

c.   Certificate(s) representing the Purchased Equity Interests will be delivered to the Secretaries of each of the Sellers or their successor entity(ies), properly endorsed within 6 months of the Purchase Effective date in accordance with the terms of this Agreement.

d.   Neither the execution and the delivery of this Agreement, nor the consummation of the transaction contemplated hereby, will conflict with, result in a breach of, constitute a default under, or require any notice or consent (except for that which has already been given or obtained) under any agreement, contract, instrument, or other arrangement to which either Seller is a party and to which any of Meredian's shares or DaniMer's units are subject.

e.   This Agreement is a valid and binding obligation of each Seller, enforceable against each Seller in accordance with its terms subject to (i) applicable bankruptcy, insolvency, moratorium and similar laws which may affect a party's rights and remedies and (ii) general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or is in equity).

## 2.   Purchaser's Representations

Purchaser hereby represents and warrants to Sellers that:

a.   Purchaser has the power and authority to enter into this Agreement and to perform its terms.

b.   Purchaser has had the opportunity to retain independent legal and financial counsel with respect to the execution and performance of this Agreement.

c.   Neither the execution and the delivery of this Agreement, nor the consummation of the transaction contemplated hereby, will conflict with, result in a breach of, constitute a default under, or require any notice or consent (except for that which has already been given or obtained) under any agreement, contract, instrument, or other arrangement to which Purchaser is a party.

d.   This Agreement is a valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms subject to (i) applicable bankruptcy, insolvency, moratorium and similar laws which may affect a party's rights and remedies and (ii) general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or is in equity).

e.   The Purchased Equity Interests will be held for investment and are not being acquired with intent to resell or distribute.

f.   Purchaser is a company registered in Florida.

g.  Purchaser understands and agrees that:

  i.    The shares and/or units evidencing the Purchased Equity Interests have not been registered under the Securities Act of 1933 or any state securities laws. Purchaser hereby represents, warrants and certifies that it is an "accredited investor" under the rules promulgated under the Act and has the ability to bear the risks of an investment in Meredian and DaniMer, or their successor entity(ies), that it was solicited to invest in the Meredian and DaniMer or their successor entity(ies) privately and did not become aware of, or obtain information regarding, the offering of shares in Meredian, DaniMer or their successor entity(ies) as a result of:

    Any advertisement, article, notice or other communication published in any newspaper, magazine or similar media or broadcast over television or radio;

    Any seminar or meeting attended by the Purchaser or other potential investors; or

    Any other form of general solicitation or general advertising;

  ii.   Purchaser bears the economic risk of any investment in and loss of value of the Purchased Equity Interests for an indefinite period of time because the shares or units evidencing the Purchased Equity Interests have not been registered under the Securities Act of 1933 or any state securities laws, and, therefore, cannot be sold unless they are subsequently registered or unless exemptions from such registration requirements are available;

  iii.  Purchaser cannot and will not transfer all or any portion of the Purchased Equity Interests acquired pursuant to this Agreement in the absence of an effective registration relating to the Purchased Shares under the Securities Act of 1933, as amended, or evidence satisfactory to the Corporation that such registration under said Act is not required in connection with such transfer, including at Corporation's option, an opinion of  Purchaser's counsel to the Corporation to that effect; and

  iv.   Prior to executing this Agreement, Purchaser has made an investigation of Meredian and DaniMer and their businesses and has had made available to it all information with respect to Meredian and DaniMer  and their businesses and the Merger that it needs to make an informed decision to execute this Agreement. Purchaser has had to its satisfaction the opportunity to examine the records of each Seller, to ask questions of the management of each Seller and to judge the profitability of Meredian and DaniMer's businesses and the Merger transaction.  Purchaser considers itself to possess the

experience and sophistication as an investor necessary to adequately evaluate the merits and risks of obligating herself to acquire shares of stock in DaniMer and Meredian or their successor entity(ies). .

Purchaser acknowledges that it has knowledge and experience in financial and business matters, in general, and this investment in particular, to be capable of evaluating the risks and merits of an investment in Meredian, DaniMer and their successor entity(ies). Purchaser recognizes the speculative nature and risk of loss associated with this investment and that Purchaser may suffer complete loss of their investments. Purchaser has an overall commitment to investments which are not readily marketable and which are not disproportionate to the Purchaser's net worth, and the Purchaser's investment in Meredian, DaniMer or their successor entity(ies) will not cause such overall commitment to become excessive. The investment in the Sellers constitutes an investment which is suitable and consistent with the Purchaser's investment programs and which enables the Purchaser to bear the risks of this investment. Purchaser represents that it has adequate resources to provide for its current needs and contingencies and have no need for liquidity in this investment;

v.  Purchaser is aware that no federal or state regulatory agency has made any finding or determination as to the fairness of the Meredian's shares or DaniMer's units as an investment nor any recommendation or endorsement of the purchase of Meredian's shares or DaniMer's units or shares or units of their successor entity(ies) as an investment.

vi. Purchaser acknowledges that investment in the Sellers is a speculative investment involving a high degree of risk of loss and that there will not be now, nor may there ever be, a public market for this investment. Accordingly, it may be difficult or impossible to liquidate this investment in case of an emergency.

vii. Purchaser confirms that, prior to making their investment decision, Meredian and DaniMer have given Purchaser and their advisors the opportunity to examine all documents, including Meredian's Articles of Incorporation and Bylaws and DaniMer's Articles of Organization and Operating Agreement and to ask questions of and receive answers from Meredian and DaniMer.

viii.    Purchaser represents and warrants that its investment in the Sellers is being acquired solely for its own account, for investment purposes only, and not with a view to, or for the resale, distribution, subdivision or fractionalization thereof; that Purchaser has no agreement or other arrangement, formal or informal, with any person to sell, transfer, pledge or subject to any lien any part of their investment in the Sellers or which would guaranty the

Purchaser any profit or protect the Purchaser against any loss with respect to this investment.

Purchaser understands that they must bear the economic risk of this investment for an indefinite period of time because the shares and units have not been registered under the Act, or any other applicable state's securities laws, and therefore cannot be resold or otherwise transferred unless subsequently registered under the Act, or any other applicable state's securities laws, which the Sellers are not obligated to do, or unless an exemption from such registration is available.

## Article III  General Matters

**1.      Indemnification**

Each party agrees unconditionally to indemnify the other party from and against any and all damages and liabilities, including without limitation litigation and arbitration expenses, costs and reasonable attorneys' fees, that such party may sustain by reason of any breach of this Agreement by the other party.

**2.      Entire Agreement**

This Agreement contains the entire agreement of the parties with respect to the subject matter hereof and it may not be changed orally but only by a written agreement signed by all of the parties to this Agreement. This Agreement supersedes any prior understanding of the Parties with respect to the granting of a 20% equity interest in Meredian and DaniMer (or their successor Entity) to Purchaser, including Section 2 of that certain Agreement between Sellers and Purchaser dated effective August ___, 2013, but only to the extent of the subject matter contained herein.

**3.      Law to Govern**

This Agreement and all matters and issues collateral thereto shall be construed according to the laws of Georgia.

**4.      Specific Performance**

Should any dispute arise regarding the rights and obligations of the parties to this Agreement, the parties agree that they will be irreparably harmed. Therefore, the parties agree that this Agreement, except as otherwise provided by law, may be specifically enforced and such conduct may be enjoined. The remedies provided by this Paragraph shall be in addition to, and not exclusive of, any other remedies which the parties to this Agreement may have.

**5.      Arbitration**

Any controversy or claim arising out of or relating to this Agreement, or its breach shall be settled by binding arbitration by the American Arbitration Association (the "AAA") and will be referred to a panel of one neutral arbiter for final determination pursuant to the Commercial Rules (the "Rules") of the American Arbitration Association (the "AAA"). Judgment upon the award rendered by the arbiter may be entered in any court having jurisdiction. Such arbitration will be administered by the AAA and held in Atlanta, Georgia. Any such arbitration will be initiated by a written request for arbitration delivered by one party to the other and to the AAA.

The arbiter will be an attorney.  The arbiter will be selected in accordance with the Rules then in effect.

The final decision of the arbiter will be binding on the parties and enforceable in any court of law having jurisdiction thereof.  The cost of arbitration shall be shared equally between the parties.

**6.      Attorneys' Fees**

If any party shall commence any action or proceeding, including submission to arbitration, against another party in order to enforce the provisions hereof, or to recover damages resulting from the alleged breach of any of the provisions hereof, the prevailing party therein shall be entitled to recover all reasonable costs incurred in connection therewith, including without limitation reasonable attorneys' fees.

**7.      Survival**

The parties agree that the covenants, representations, warranties and agreements contained herein shall survive the execution of this Agreement and the closing of the transaction contemplated hereby.

**8.      Waiver of Breach**

The waiver by any party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach by any party.

**9.      Agreement Binding**

When signed by all of the parties, except as otherwise provided herein this Agreement shall be binding upon the parties, their legal representatives, heirs, successors and assigns.

**10.     Construction**

This Agreement is a product of the negotiation of all of the parties. This Agreement shall not be construed in favor of, or against, any party hereto.

**11.     Severability**

If any provision of this Agreement becomes or is found to be illegal or unenforceable for any reason, such clause or provision must first be modified to the extent necessary to make this Agreement legal and enforceable and then if necessary, second, severed from the remainder of the Agreement to allow the remainder of the Agreement to remain in full force and effect.

**12.     Captions**

All captions, titles, headings and divisions hereof are for purposes of convenience and reference only, and shall not be construed to limit or affect the interpretation of this Agreement.

**13.     Counterparts – Facsimile Signatures**

This Agreement may be executed in one or more counterparts, all of which taken together shall constitute one instrument.  A facsimile copy of a signature on this Agreement shall be acceptable as and deemed an original signature.

**14.     Further Assurances**

Each party shall execute and deliver or cause to be executed and delivered to the other such further instruments and shall take such other action as the other may reasonably require to help effectuate the contemplated transactions.

**15.**   <u>**Hoffman & Associates' Role**</u>

The Parties agree that Hoffman & Associates, Attorneys-at-Law, L.L.C. ("Hoffman") is representing the Parties on a purely transactional basis. Hoffman has not been asked to provide guidance on any aspect of this transaction other than to document the business agreement between the Parties. Should a dispute between the Parties arise based on the terms of this Agreement, the Parties agree that Hoffman will not represent any party's interests against any other party and that each party should hire independent counsel in such a situation.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date indicated below to be effective as of March 1, 2014.

**SELLERS:**

**MEREDIAN, INC**

_____          3/1/14
_____              _____
President, Meredian, Inc              Date of Execution

**DANIMER SCIENTIFIC, L.L.C.**

_____          3/1/14
_____              _____
President, DaniMer Scientific, L.L.C. Date of Execution

**PURCHASER:**

**ALTON BIO, LLC**

_____          3/1/14
_____              _____
PAUL PEREIRA                         Date of Execution
Manager, Alton Bio, LLC

Meredian Subscription stock purchase agreement 11-12

# EXHIBIT C

## PROMISSORY NOTE

FOR VALUE RECEIVED, the undersigned (hereinafter referred to as "Payor"), promises to pay to the order of MEREDIAN, INC., a Georgia Corporation ("Meredian") and DaniMer Scientific, L.L.C., a Georgia limited liability company ("DaniMer"), acting jointly, (hereinafter referred to together as "Holders" or separately as a "Holder"), the principal sum of Six Million, Six Hundred Thousand and 00/100 Dollars ($6,600,000, with simple interest thereon at Zero and 28/100 percent (.28%) per year.  Interest shall be payable annually and the principal balance shall be payable in one (1) installment on March 1, 2018. Payments of principal and interest will be made at Holders' address, or at such other place as Holders may designate.

This Promissory Note is issued pursuant to that certain Amendment to the Alton Bio-DaniMer Scientific Contract Agreement pursuant to that certain Subscription and Stock Purchase Agreement by and between Payor and Holders dated on or about the Effective Date hereof.

1.      Payor shall have the right to prepay the principal amount outstanding in whole or in part at any time without penalty.  Payor hereby waives all presentment, demand, protest, notice of dishonor, non-payment, demand and protest.

2.      In the event any payment required herein is not paid within 180 days of the due date, Payor shall pay an extra late charge of ten percent (10%) of the late amount, for the purpose of defraying the expense of following up and handling the delinquent payment.

3.      If Payor fails to pay when due any amount payable hereunder, which failure continues uncured for a period of 180 days after the receipt of written notice, Payor shall be in default hereunder.  In the event of a default, at the option of Holders, the total unpaid balance hereof, including the entire principal amount outstanding, and all accrued interest and late charges thereon may be declared, and thereupon immediately shall become due and payable, and Holders may avail themselves of any and all remedies of a creditor under the Uniform Commercial Code and other applicable law.

4.      Holders shall give Payor 30 days written notice of any Change of Control.  In the event of a Change of Control, Holders may declare this Note due and payable on or before the date of the Change of Control or IPO.

As used in this Note, *Change of Control* means either a change in ownership of either of the Holders or a change in ownership of a substantial portion of either of the Holders' assets where:

the acquiring party, whether an individual or a group, acquires Common Stock or membership units of the Holder that, together with any Common Stock already held by the acquiring party, constitute more than 50% of the Common Stock or membership units of the Holder; and

the acquiring party did not own more than 50% of the Common Stock or membership units prior to the acquisition of the Common Stock or membership units.

A change in ownership of a Holder occurs on the date that the acquiring party acquires stock or membership units of either of the Holders that, together with any stock already held by the acquiring party, constitutes more than 50% of the Class A Voting Stock or voting Membership units, as the case may be, of either Holder.

A change in ownership of a substantial portion of the Holder's assets occurs on the date that any one person, or more than one person acting as a group, acquires (when combined with acquisitions during the 12-month period ending on the date of the most recent acquisition by such person or group) assets from the Holder that have a total gross Fair Market Value equal to or more than 40% of the total gross Fair Market Value of all of the assets of the Holder immediately prior to the acquisition or acquisitions, other than in the ordinary course of the Holder's business.

Notwithstanding the foregoing, there is no Change of Control event when, at or immediately after the transfer, the Class A Voting Stock, voting Membership Interests or assets of Holders are transferred to an entity that is controlled by one or more of the owners of either Holder. Further, a transfer of assets by the Holder is not treated as a change in ownership of a substantial portion of the Holder's assets if the assets are transferred to:

> an owner of the Holder who was an owner immediately before the asset transfer in exchange for or with respect to the owner's equity interest in the Holder;

> an entity, 50% or more of the voting power of which is owned, directly or indirectly, by the Holder;

> a person, or more than one person acting as a group, that directly or indirectly owns 50% or more of the voting power of all the outstanding securities of the Holder; or

> an entity, at least 50% of the voting power of which is owned, directly or indirectly, by a person or group described in this Subsection.

A *Change in Control* shall also include any Initial Public Offering ("IPO") of Holder shares. IPO means the consummation of a public offering for shares of Holder stock pursuant to a registration statement filed with the Securities and Exchange Commission on Form S-1, or some similar form.

On February 19, 2014, shareholders of Meredian and members of DaniMer approved a proposed Merger of the two businesses subject to approval by their lenders. Notwithstanding anything contained herein to the contrary, Change of Control does not include a reorganization, restructuring or merger of Meredian and DaniMer whereby their businesses are combined or merged into one entity.

5. In the event of the death of Paul Pereira, the Manager of Payor, Holder may declare this note due and payable within 90 day of Paul Pereira's date of death. Pereira's Personal Representative, shall, within 90 days of his date of death, pay all amounts due under this Note to the order of Holder.

6.    Payor shall pay all costs of collection including, but not limited to, reasonable attorneys' fees in an amount not to exceed fifteen (15%) percent of all principal and interest owing hereunder, if collected by or through an attorney at law.

7.    This instrument shall be governed by and interpreted in accordance with the laws of the State of Florida.

8.    Holder may, in addition to any other rights and remedies that may be available to it, set off all or any portion of amounts Holder owes to Payor against any amounts otherwise due and owing from Payor to Holder under this Promissory Note . Any amounts so set off shall be deemed to have been paid and set offas of the date on which written notice of such set off is given to Payor.

9.    Payor as used herein shall include the undersigned, and all endorsers, guarantors and sureties of the Note, and shall also include the heirs, legal representatives, successors and assigns of the Payor, all of whom shall be jointly and severally liable hereunder. Words herein importing the masculine shall include females, and words importing persons shall include bodies corporate, and the singular shall include the plural, and vice-versa. The rights of Holder hereunder shall inure to the benefit of his heirs, legal representatives, successors and assigns.

10.    Except for any notice required under applicable law to be given in another manner, (a) any notice to Payor provided for in this Note shall be given in writing, by mailing such notice by certified mail addressed to Payor at the address shown below or at such other address as Payor may designate by notice to Holder as provided herein, and (b) any notice to Holder shall be given by certified mail to Holder's address stated herein or to such other address as Holder may designate by notice to Payor as provided herein. Any notice provided for in this Note shall be deemed to have been given to Payor or Holder when given in the manner designated herein. Notice given as herein above provided shall be deemed received by the party to whom it is addressed on the third calendar day following the date on which said notice is deposited in the mail.

(a)    To Holder:        Meredian, Inc. and
                         DaniMer Scientific, L.L.C.
                         1301 Colquitt Highway
                         Bainbridge, GA 39817

(b)    To Payor:        Alton Bio, LLC
                        1301 Colquitt Highway
                        Bainbridge, GA 39817

11.    The waiver of a breach of any provision, term or condition of this Note shall not operate or be construed as a waiver of any subsequent breach, and the acceptance of a past due payment shall not be construed as a waiver of Holder's rights to require strict compliance with all terms and conditions herein.

12.     This Note may be executed in any number of counterparts, each of which shall be an original, but all of which together shall be deemed to constitute one instrument.

13.     Time is of the essence of this Note.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date indicated below to be effective as of March 1, 2014.

PAYOR:

Alton Bio, LLC

_Stephanie Coker_
Witness

By:_____(SEAL)
        PAUL PEREIRA, Manager

HOLDER:

Meredian, Inc.

_Stephanie Coker_
Witness

By:_____(SEAL)
    _J Blake Lindsey_, President

Danimer Scientific, LLC

_Stephanie Coker_
Witness

By:_____(SEAL)
    _J Blake Lindsey_, President

# EXHIBIT D

## ALTON CONSULTING GROUP – DANIMER SCIENTIFIC CONTRACT

This Agreement (the "Agreement") by and between ALTON CONSULTING GROUP, LLC, a Florida limited liability company ("Alton") and MEREDIAN HOLDINGS GROUP, INC., a Georgia Corporation ("Meredian"), is being executed on this 25th April, 2014 with an effective date of January 1, 2014 (the "Effective Date").

1.    Scope.   Paul Pereira ("Pereira") is the principal Member of Alton. Pereira, acting through Alton, will act in the capacity of Executive Chairman to Meredian in turning its business around and shall work a minimum of two weeks per month of Pereira's time to complete the turnaround plan (the "Turnaround Plan"), which includes (i) the restructuring and reorganizing of the Company (much of which has been completed), (ii) pursuing additional licensing opportunities for Company's technology, and (iii) raising of additional capital to complete the construction of Meredian production facility with a production capacity of at least 30 million pounds of PHA resign annually (the "New Facility").   Alton will act as a consultant regarding each element in the turnaround plan

2.    Monthly Payment to Alton.   During the Term of this Agreement, Meredian shall pay Alton $50,000 gross per month for turnaround consultancy services and Alton will be responsible for their taxes.

3.    Term.   The initial term of this Agreement shall be three years beginning on the effective date. Meredian, or any successor entity, shall have the option to renew this Agreement for successive periods by mutual agreement. Successive periods can be any length of time mutually agreed. Together, the initial term and successive terms, if any, are, for purposes of this Agreement, referred to as the "Term".

4.    Royalties.   Meredian will pay Alton for any agreements signed within five years from the date of execution of 25th April 2014 the following: four percent (4%) of net royalties received from any licensing agreements executed with any third party during the five-year period commencing on April 25, 2014 for a period of the first five years from the date of the licensing agreement, three percent (3%) for the same licensing agreements for the subsequent five-year period and two percent (2%) for the same license agreements for the remainder of the license agreement or up to ten years. The above fees shall be charged on net royalties received from any and all licensing agreements entered into by Meredian or its successor(s) during the Term of this Agreement regardless of whether the licensee was introduced to Meredian by Alton.

5.    Capital Infusions.   Meredian shall pay Alton five percent (5%) of any capital infusions, whether debt or equity, received by the Meredian during the period of Alton's engagement by Meredian up to $100MM of any type of financial instrument utilized. This fee shall apply to all capital infusions or financial instruments regardless of whether the investors making such infusions were introduced to Meredian through Alton.

6.    Early Termination.   This Agreement may be terminated before the ending of the Term by Meredian giving 90 days notice in writing and paying out the remainder of the Term only without cause.

1



    (i)    <u>Mutual Agreement.</u>  This Agreement may be terminated at any time by the mutual written agreement of Meredian and Alton.

    (ii)    <u>By Meredian With Cause.</u>  Meredian may terminate this Agreement at any time for Cause upon written notice to Alton, which notice shall specify the reason for termination.  For purposes of this Subsection 4(ii), "Cause" shall include, but shall not be limited to the following: Pereira's fraud, substantial and continuous nonperformance of assigned duties, failure to comply with any reasonable material written policy of Meredian, continuous performance of duties at a level significantly below the performance level expected from an contractor in a similar position and at a similar compensation level within Meredian's industry, unlawful activities involving moral turpitude for which Pereira is indicted or convicted or pleads guilty or a material continuing breach of this Agreement by Alton.

    (iii)    <u>By Alton With Good Reason.</u>  This Agreement may be terminated by Alton at any time for Good Reason upon written notice to Meredian, which notice shall specify the reason for termination.  For purposes of this Subsection 4(iii), "Good Reason" shall be limited to the following:  (i) Pereira's title is changed such that Pereira's title has significantly diminished stature; (ii) Pereira's duties are materially altered such that they are materially diminished; (iii) Pereira is directed to act in an illegal or unethical manner; or (iv) Pereira's reporting structure is changed without Pereira's consent.

7.    <u>Expenses.</u>  Meredian shall reimburse Alton for the following upon presentation of appropriate documentation to substantiate such expenses pursuant to the Companies' guidelines governing reimbursement of expenses:

    (i)    reasonable expenses with an agreed upon maximum incurred for local accommodation and transport expenses for Paul Pereira and for two return air travel tickets from Company's headquarters (or nearest airport) to Miami, Florida per month;

    (ii)    other expenses approved in advance by the Companies' Financial committees.

    (iii)    Alton will be eligible to participate in the Company's standard benefits programs, including employee stock options, health insurance, 401k plans, holidays and sick leave, subject to all provisions of the plan documents governing those programs.

8.    <u>Non-Compete; Confidentiality.</u>  Alton and Pereira agree to execute and be bound by the terms and conditions of the Non-Compete Agreement; Protection of Confidential Information, a copy of which is attached hereto incorporated herein by reference.

9.    <u>Miscellaneous.</u>

    (a)    <u>Finder Agreement.</u>  Alton is not a broker-dealer and does not hold itself out as such.  To the extent Alton is paid for capital infusions of the Company, it is for consultations regarding implementation of the various elements of the Companies' turnaround plan.  To the extent Alton may deal with third party investors, it will be solely to introduce the

2



potential investor to Companies. Alton shall not negotiate on behalf of Companies or any successor entity, offer any specifics regarding investments in Companies or any successor entity or offer any investment advice to third party investors.

        (b)    <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement between the parties relating to the Restrictive Covenants and there are no representations, warranties, covenants or obligations except as set forth herein.  This Agreement supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions, written or oral, of the parties hereto, relating to any transaction contemplated by this Agreement.

        (b)    <u>Amendments</u>.  This Agreement may be amended only in writing executed by the parties hereto.

        (c)    <u>Assignment</u>.  This Agreement may be assigned by Companies to any successor of the Companies.  Alton may not assign this Agreement without the consent of the Companies or the successor thereof.

        (d)    <u>Partial Invalidity</u>.  If any provision of this Agreement shall for any reason be held invalid or unenforceable by any court, governmental agency or arbitrator, of competent jurisdiction, such invalidity or unenforceability shall not affect any other provision hereof, but this Agreement shall be construed as if such invalid or unenforceable provision had never been contained herein.  If any Restrictive Covenant under Section 1 of this Agreement is found to be unenforceable, a court may equitably reform the provision to make it enforceable.

        (e)    <u>Recitals: Enumeration and Headings</u>.  The enumeration and headings contained in this Agreement are for convenience of reference only and are not intended to have any substantive significance in interpreting this Agreement.

        (f)    <u>Survival</u>.  Upon expiration or termination of this Agreement, the obligations of the parties to each other shall come to an end, except that the compensatory provisions of this Agreement shall stay in effect until all amounts owed thereunder are paid, and the provisions of the Non-Compete Agreement; Protection of Confidential Information described in Section 11 shall survive pursuant to the terms thereof.

        (g)    <u>Gender and Number</u>.  Unless the context otherwise requires, whenever used in this Agreement the singular shall include the plural, the plural shall include the singular, and masculine gender shall include the neuter or feminine gender and vice versa.

        (h)    <u>Computation of Time</u>.  Whenever any determination is to be made or action to be taken on a date specified in this Agreement, if such date shall fall upon a Saturday, Sunday or a legal holiday, the date for such determination or action shall be extended to the first business day immediately thereafter.

        (i)    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original document, but all of which counterparts shall together

3



constitute one and the same instrument.  The Agreement shall not be effective unless and until executed by all parties hereto.

        (j)    <u>Governing Law</u>.  This Agreement shall be deemed to be made in, and in all respects shall be interpreted, construed and governed by and in accordance with, the laws of the State of Georgia. The parties hereto agree that the state or federal courts in Decatur County, Georgia shall have personal jurisdiction over them with respect to all matters arising from or with respect to this Agreement. Such courts shall be the exclusive forum for the resolution of any matter or controversy arising from or with respect to this Agreement.

    12.    <u>Hoffman & Associates' Role</u>.  The Parties agree that Hoffman & Associates, Attorneys-at-Law, L.L.C. ("Hoffman") is representing the Parties on a purely transactional basis. Hoffman has not been asked to provide guidance on any aspect of this transaction other than to document the business agreement between the Parties.  Should a dispute between the Parties arise based on the terms of this Agreement, the Parties agree that Hoffman will not represent any party's interests against any other party and that each party should hire independent counsel in such a situation.  Please initial below indicating each party has read this paragraph

                                    Initial

                                      For Danimer
                                      For Meredian
                                      For Alton

                                  (Signature Page Follows)

4



IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

MEREDIAN HOLDINGS GROUP, INC.

By: _John A. Dowdy_
Name: John A. Dowdy, Jr.
Title: Director

ALTON CONSULTING GROUP, LLC
By: _____
Name: _____PAUL PEREIRA_____
Title: _____CEO_____

5

# EXHIBIT E

# Meredian Holdings Group, Inc.
# Nonqualified Deferred Compensation Agreement

### 1.    Purpose

This Nonqualified Deferred Compensation Agreement (the "Agreement") is intended to advance the interests of Meredian Holdings Group, Inc., a Georgia corporation (hereinafter the "Payor") by providing an unfunded, nonqualified deferred compensation benefit to Alton Bio, LLC, a Florida limited liability company, (the "Participant") that will serve as an additional incentive for the Participant and Participant's Principal, Paul Pereira, to promote the success of the Payor, increase the Payor's value and encourage such Participant to maintain its consulting with the Payor on a long-term basis.

### 2.    Effective Date

This Agreement shall become operative and in effect on June 15, 2014 ("Effective Date").

### 3.    Duration

This Agreement shall be terminated as provided in Section 18.

### 4.    Benefit Award

The Payor hereby awards Participant a benefit award ("Benefit Award") in the aggregate amount of $6,618,480.00, on the dates and in the amounts described in Section 6, below.

### 5.    Vesting

All Benefit Awards granted under the terms of this Plan and a Participant's Participation Agreement are 100% vested on June 15, 2018.

A. Termination of Employment by Payor.  Notwithstanding the vesting provisions of this Section 5, all credits of Benefit Awards to a Participant's Deferral Account shall become fully vested if Paul Pereira's employment as a consultant for Payor (whether such employment is direct, or indirect through Participant or any other entity controlled by Participant) is terminated by Payor for any reason whatsoever.

B. Termination of Employment by Paul Pereira.  Except as otherwise provided herein, all credits of Benefit Awards to Participant's Deferral Account not vested in Participant before Paul Pereira's termination of his employment as a Consultant for (whether such employment is direct, or indirect through Participant or any other entity controlled by Participant) will be completely forfeited by Participant and stricken from Participant's Deferral Account and will not be distributed, credited, or allocated in any other way to the benefit of any remaining Participants.  These nonvested credits revert to the Payor.

### 6.    Payment of Benefits

Except as otherwise provided herein, Payor shall make payment of vested Benefit Awards according to the dates and amounts described as follows:

One payment of $6,618,480.00 on June 15, 2018

### 7.  Acceleration of Vesting and Payments Upon Change of Control

Payor shall give 30 days written notice to Participant of any Change of Control.

Notwithstanding the vesting provisions identified in Section 5, all Benefit Awards shall become fully vested upon notice of a Change of Control. Notwithstanding the payment of benefits provisions identified in Section 6, the Payor shall pay to the Participant an amount equal to the full Benefit Award less any amounts previously paid to Participant under this Agreement in one lump sum on or before the date of a Change of Control. Any payment to the Participant will be subject to applicable withholding tax, if any, and other taxes that may be required with respect to amounts payable by the Payor to the Participant. This payment shall be deemed full payment under this Agreement.

As used in this Plan, *Change of Control* means either a change in ownership of the Payor or a change in ownership of a substantial portion of the Payor's assets where:

> the acquiring party, whether an individual or a group, acquires Common Stock or membership units of the Payor that, together with any Common Stock already held by the acquiring party, constitute more than 50% of the Common Stock, or Membership Units of the Payor; and

> the acquiring party did not own more than 50% of the Common Stock or membership units, as the case may be, prior to the acquisition of the Common Stock or membership units.

A change in ownership of a Payor occurs on the date that the acquiring party acquires stock of the Payor, together with any stock, units, or equity interests already held by the acquiring party, constitutes more than 50% of the Class A Voting Stock or 50% of the voting membership units of the Payor, as applicable.

A change in ownership of a substantial portion of the Payor's assets occurs on the date that any one person, or more than one person acting as a group, acquires (when combined with acquisitions during the 12-month period ending on the date of the most recent acquisition by such person or group) assets from the Payor that have a total gross Fair Market Value equal to or more than 40% of the total gross Fair Market Value of all of the assets of either of the Payor immediately prior to the acquisition or acquisitions, other than in the ordinary course of the Payor's business.

Notwithstanding the foregoing, there is no Change of Control event when, at or immediately after the transfer, the Class A Voting Stock, membership units or assets are transferred to an entity that is controlled by one or more of the owners of the Payor. Further, a transfer of assets by the Payor is not treated as a change in ownership of a substantial portion of the Payor's assets if the assets are transferred to:

> an owner of the Payor who was an owner immediately before the asset transfer in exchange for or with respect to the owner's equity interest in the Payor;

> an entity, 50% or more of the voting power of which is owned, directly or indirectly, by the Payor;

> a person, or more than one person acting as a group, that directly or indirectly owns 50% or more of the voting power of all the outstanding securities of the Payor; or

an entity, at least 50% of the voting power of which is owned, directly or indirectly, by a person or group described in this Subsection.

A *Change in Control* shall also include any Initial Public Offering ("IPO") of a Payor's shares or units. IPO means the consummation of a public offering for shares of a Payor's stock or units pursuant to a registration statement filed with the Securities and Exchange Commission on Form S-1, or some similar form.

8.     **Acceleration of Vesting and Payments Upon Death**

Notwithstanding the vesting provisions of Section 5, all Benefit Award shall become fully vested upon the death of Paul Pereira. Notwithstanding the payment of benefits provisions of Section 6, Payor shall, within 90 days of Paul Pereira's date of death pay Participant an amount equal to full Benefit Award less any amounts previously paid to Participant under this Agreement.  Any payment to the Participant will be subject to applicable withholding tax, if any, and other taxes that may be required with respect to amounts payable by the Payor to the Participant. This payment shall be deemed full payment under this Agreement.

9.     **Special Ledger**

The Benefit Award to Participant shall be credited to an account ("Deferral Account") that the Payor maintains in a special ledger for Participant as part of its general bookkeeping records for the purpose of recording and tracking Benefit Awards.  The separate Deferral Accounts shall be for record keeping purposes only and shall not be construed to mean that such account has been funded in any way, or that any specific asset or monies have been segregated or otherwise set aside for the Participant or the payment of the Payor's obligations to Participant under this plan.

10.    **Funding**

The Payor may, but need not, invest and reinvest an amount of money less than or equal to the balance of all Deferral Accounts in any assets that may be selected by the Administrative Committee in its sole discretion.   In the exercise of the foregoing discretionary investment powers, the Administrative Committee may engage investment counsel and, if it so desires, may delegate to such counsel full or limited authority to select the assets in which the funds are to be invested.  Any increase or decrease in any investment selected by the Administrative Committee or such investment counsel shall be reflected by appropriate increases or decreases to the amounts credited to the Deferral Accounts.  Any and all funds that may be invested by the Payor shall be appropriately identified for purposes of calculating said increases and decreases. In the event any funds represented by credits to the Deferral Accounts are invested in life insurance or an interest in life insurance, only the cash values attributable to any such life insurance policy or interest therein, not any death benefit, will be credited to such Deferral Account.  As provided more fully in Section 14, title to and beneficial ownership of any and all such assets, whether cash or investments, shall at all times remain in the Payor and Participant shall not have any interest whatsoever in such assets of the Payor.  Credits to the Deferral Account shall be reduced to reflect any commission, surrender charge or other cost that may be imposed on the Payor with respect to any investment, reinvestment, sale, exchange or transfer of any funds invested pursuant to this Section.

11.   **Administration**

The Board of Directors of the Payor shall serve as the Named Fiduciary ("Named Fiduciary") of this Agreement. The Board of Directors shall be fully justified in relying or acting in good faith upon any report made by the independent public accountants of the Payor and upon any other information furnished in connection with this Agreement. In no event shall any person who is or shall have been a member of the Board of Directors (or any officer or employee to whom duties are delegated in accordance with this Agreement) be liable for any determination made or other action taken or any omission to act in reliance upon any such report or information, or for any action taken, including the furnishing of information, or failure to act, if in good faith.

12.   **Claims Review**

This Section contains a claim review procedure to provide a method by which Participant or his Beneficiary (collectively the "Claimant") has a reasonable opportunity to appeal a denial of claim for benefits hereunder to the Named Fiduciary of this Agreement for a full and fair review.

(a)   The Claimant or its duly authorized representative:

(1)   may request a review upon written application to the Named Fiduciary;

(2)   may review pertinent company documents and other papers which affect the claim; and

(3)   may submit issues and comments in writing.

A Claimant (or its duly authorized representative) shall request a review by filing a written application for review with the Named Fiduciary at any time within sixty (60) days after receipt by the Claimant of written notice of the denial of its claim.

(b)   A decision on review of a denied claim shall be made in the following manner:

(1)   The decision on review shall be made by the Named Fiduciary who may, in their discretion, hold a hearing on the denied claim. Such decision shall be made promptly, and not later than sixty (60) days after receipt of the request for review, unless special circumstances (such as the need to hold a hearing) require an extension of time for processing. In such case, the Named Fiduciary shall notify the Claimant in writing that there will be a delay and explain the reason for the delay. A decision shall be rendered as soon as possible, but not later than one hundred twenty (120) days after receipt of the request for review; and

(2)   The decision on review shall be in writing and shall include specific reasons for the decision, written in a manner calculated to be understood by the Claimant with

specific references to this Agreement or policy provisions upon which the decision is based. If the decision on review has not been received by the Claimant within the time frame referred to in subsection (1) above, the claim shall be deemed denied on review.

(c)   The Named Fiduciary has the authority to manage the operation and administration of this Agreement.   The Named Fiduciary may retain advisors and allocate fiduciary responsibilities to the extent permitted by the Employee Retirement Income Security Act of 1974, as amended from time to time.

## 13.   Limitation of Rights

Nothing contained in this Agreement may be construed to:

(a)   Limit in any way the right of Payor to terminate Participant's consulting relationship with the Payor, with or without cause, at any time;

(b)   Be evidence of any employment or other agreement or understanding, express or implied, that Payor continue to contract with Participant in any particular position or at any particular rate of remuneration; or

(c)   As more completely discussed in Section 14, give Participant a right or interest in any fund or specific asset of the Payor.

## 14.   Source of Payments

All benefits under the Agreement shall be provided out of the general assets of the Payor at the time such benefits are to be paid to the Participant. The Participant's Deferral Account is strictly a device for measuring the amount that the Payor promises to pay pursuant to the Agreement. That account and any cash or assets represented by credits to it are not set aside for Participant or for the purpose of paying any benefits due under the Agreement. Participant, his Beneficiary, and any other person or persons having or claiming a right to payments hereunder or to any proprietary rights under the Agreement shall rely solely on the unsecured promise of the Payor set forth herein, and nothing in this Agreement shall be construed to give Participant, his estate or Beneficiary, or any other person or persons any right, title, ownership or claim in or to the Participant's Deferral Account or to any property of any kind whatsoever owned by the Payor or in which it may have any right, title or ownership now or in the future, including, but not limited to, any asset, fund, reserve, account or insurance or annuity contract that the  Payor may purchase or establish for the purpose of enabling it to carry out its promise to  Participant. Participant shall have the right to enforce his claim against the Payor in the same manner as any other unsecured creditor. Moreover, nothing contained in this Agreement and no action taken pursuant to the provisions of the Agreement shall require the Payor to fund any credits made to a Deferral Account, create or be construed to create a trust of any kind, or create a fiduciary relationship between the Payor and the Participant, his Beneficiary or any other person.

### 15.    Nonalienation of Benefits

Any benefits granted or any other right or benefit under this Agreement shall not be subject to anticipation, alienation, sale, assignment, pledge, encumbrance, or charge, and any attempt to anticipate, alienate, sell, assign, pledge, encumber, or charge the same shall be void.  No right or benefit hereunder shall in any manner be liable for or subject to the debts, contracts, liabilities, or torts of the person entitled to such benefits.   If Participant should become bankrupt or attempt to anticipate, alienate, sell, assign, pledge, encumber or charge any right or benefit hereunder, then such right or benefit shall, in the discretion of the Board of Directors, cease and terminate, and in such event, the Payor may hold or apply the same or any part thereof, for the benefit of the Participant or Beneficiary, his spouse, children, or other dependents, or any of them, in such manner and in such proportion as the Board of Directors may deem proper.

### 16.    Incapacity of Participant or Beneficiary

If the Board of Directors shall find that any person to whom any payment is payable under this Agreement is unable to care for his affairs because of illness or injury or because he is a minor, any payment due (unless a prior claim therefore shall have been made by a duly appointed guardian or other legal representative) may be paid to the spouse, a child, a parent, or a sibling, or any other person or entity deemed by the Board of Directors  to have incurred expense for such person otherwise entitled to payment, in accordance with the applicable provisions of the Agreement.  Any such payment shall be a complete discharge of the liabilities of the Payor under this Agreement

### 17.    Compliance with Law

The operation and implementation of this Agreement and the obligation of the Payor to make payment of benefits hereunder shall be subject to all applicable laws, rules, and regulations and to such approvals by any government agencies as may be deemed necessary or appropriate by the Board of Directors.  It is intended by the parties that this Agreement complies with the provisions of the Internal Revenue Code, as amended, and Regulations promulgated thereunder and the Employee Retirement Income Security Act of 1974, as in effect at the time of the execution of this Agreement, in order to constitute an unfunded, nonqualified deferred compensation arrangement for the benefit of a highly compensated employee or independent contractor.  If, at a later date, the laws of the United States or of Georgia are construed in such a way as to make this Agreement void or in opposition to the above intent, then this Agreement will be given effect in such a manner as will best carry out the original purposes and intentions of the parties.

### 18.    Set Off

Payor may, in its sole discretion, set off all or any portion of amounts they owe to Participant under this Agreement against any amounts due and owing from Participant to Payor.  Any amounts so set off shall be deemed to have been paid and set off as of the date on which the Payor notifies Participant in writing of the set off amount.

### 19.    Intended Tax Treatment

The Payor does not represent or warrant that any particular federal, state, or local income, payroll, Social Security, personal property, estate or other tax consequence will result from this Agreement.  Nevertheless, for purposes of construing the Agreement, it is the

Payor's intent that the Agreement will have the tax consequences discussed below. The Agreement is intended to be an unfunded, nonqualified deferred compensation plan. It is intended that any benefits payable to Participant under this Agreement shall not be deemed compensation and shall not be included in the Participant's taxable income under federal or state law until such payment(s) is/are actually received by the Participant or his Beneficiary. It is further intended that for the purposes of Social Security coverage (in accordance with Section 3121(v)(2) of the Internal Revenue Code, as amended), all benefits shall nonetheless be deemed compensation at the time Section 3121 (v)(2) or the regulations promulgated thereunder require or allow such benefits to be treated as compensation. To the extent required by the laws in effect from time-to-time, the Payor may withhold from the regular compensation paid to the Participant as an independent contractor of the Payor or from the benefits paid to Participant hereunder, whatever taxes are required to be withheld on such benefits for federal, state or local government purposes, if any.

**20.   Other Benefit Plans**

Participant's benefits under this Agreement shall not be deemed to be earnings, base salary or compensation for the purpose of calculating the amount of the Participant's benefits or contributions under a pension plan or retirement plan (qualified under Section 401(a) of the Internal Revenue Code, as amended), the amount of life insurance under a life insurance plan supplied by the Payor, the basis for establishing disability payments under a disability plan or the basis or amount for any other benefit plan supplied by the Payor where the benefits are based upon an employee or contractor's compensation except to the extent specifically provided in such plan. No amount distributed to Participant under this Agreement shall be deemed to be earnings, base salary or a part of Participant's total compensation with respect to Participant's entitlement to benefits under any employee or contractor benefit plan established by the Payor for its employees or contractors unless otherwise specifically provided in this Agreement or the Participant's Participation Agreement.

**21.   Amendment or Termination of Agreement**

This Agreement may be amended or terminated by the mutual written consent of the Participant and the Payor.

**22.   Not an Employment Contract**

This Agreement shall not be construed so as to create a contract of employment between Participant and the Payor, nor do they restrict the right of Payor to terminate the consulting relationship with Participant or Participant's right to terminate the consulting relationship with Payor. Participant and the Payor are free to enter into separate contracts governing the terms of Participant's consulting relationship with Payor if reduced to writing and signed by both the Payor and Participant.

**23.   Captions**

All captions, titles, headings and divisions hereof are for purposes of convenience and reference only, and shall not be construed to limit or affect the interpretation of this Agreement.

24.    **Binding Effect**

This Agreement shall be binding upon and inure to the benefit of Payor, Participant and their permitted successors, assigns, heirs, executors, administrators and legal representatives.

25.    **Governing Law**

This Agreement shall be construed in accordance with and governed by the laws of Georgia.

26.    **Severability**

If any provision of this Agreement becomes or is found to be illegal, unenforceable, void, or voidable, then such clause or provision must first be modified to the extent to make this Agreement legal and enforceable and then, if necessary, second, severed from the remainder of this Agreement to allow the remainder of this Agreement to remain in full force and effect.

27.    **Compliance with 409A**

Notwithstanding anything in the Agreement to the contrary, (i) this Agreement may be amended by the Board of Directors at any time, retroactively if required, to the extent required to conform the Agreement to Section 409A of the Internal Revenue Code, and (ii) no provision of the Agreement shall be followed to the extent that following such provision would result in a violation of Section 409A of the Internal Revenue Code.


IN WITNESS WHEREOF, this Agreement is entered into as of the Effective Date hereto.


**Participant:**



PAUL PEREIRA
Manager, Alton Bio, LLC


**Payor:**

**Meredian Holdings Group, Inc.,**
**A Georgia Corporation**

By:       S Blake C
Print Name:    S Blake Lindsay
Title:        President

# EXHIBIT F



providing solutions for a healthier planet

November 3, 2015

Alton Consulting Group, LLC
Paul Pereira                                      **BY FEDERAL EXPRESS**
1521 Alton Road, #287                                      **BY EMAIL**
Miami Beach, FL 33139

Dear Paul:

This letter is being written to you in your capacity as the Chief Executive Officer of Alton Consulting Group, LLC ("Alton") and in your personal capacity as an employee of Meredian Holdings, Inc. (the "Company"). This letter shall serve as written notice to Alton pursuant to Section 6(ii) of that certain agreement between Alton and the Company executed on April 25, 2014 (the "Agreement") that the Agreement is hereby terminated effective immediately for "Cause" pursuant Section 6(ii) of the Agreement. This letter shall also serve as notice to you that your employment with the Company, including in your capacity as the Chief Executive Officer and Executive Chairman, is hereby terminated effectively immediately for cause.

Our reasons for taking this action include, but are not limited to, each of the following actions:

1. The falsification of your resume and credentials both prior to and during your employment with the Company and your failure to report the same to the Board in a timely manner;

2. Altering emails from Company customers and sending altered emails to potential investors;

3. Committing acts of corporate waste, including, but not limited to, overspending on travel expenses that benefitted both you and your wife;

4. Exercising poor business judgment;

5. Committing acts of financial self-dealing, including insisting upon the Company using your wife's company to provide services, utilizing the Company's funds to develop press releases for the Alton Consulting website, and utilizing the Company's Miami office as the place of business for the Alton Consulting office;

6. Engaging in unethical conduct, including modifying the Company's financial projections, presenting falsified documents to potential customers, and breaching confidentiality agreements with potential customers;

7. Engaging in unprofessional behavior, including being grossly intoxicated at business meetings, failing to attend business meetings, sleeping during meetings and making inappropriate statements;

agroreco   agrocrush   danimer   meredian

140 Industrial Boulevard   |   Bainbridge GA 39817   |   www.meredianinc.com



**MHG**

providing solutions for a healthier planet

8.  Unjustly threatening the chief officers with termination at various times, being discourteous and unpleasant to the chief officers, and creating an environment not conducive to furthering the Company's business;

9.  Failing to comply with the reasonable material written polices of the Company;

10. Substantial and continuance nonperformance of assigned duties, as well as the performance of duties at a level below the performance level of others in similar positions, as demonstrated by your failure to make substantial progress towards satisfying the primary goals of the Agreement; and

11. A pattern of behavior and information that has caused the Board to lose confidence in your ability to lead the company effectively.

The Board of Directors of the Company has determined that each of these acts and omissions constitutes "Cause" under Section 6(ii) of the Agreement.

You are hereby instructed to immediately return to the Company at 140 Industrial Blvd., Bainbridge, GA 39817, all computers, electronic devices, automobiles, correspondence, records, documents, software, promotional materials, and other Company property, including all copies, which are in your possession by, through, or in the course of your employment, regardless of the source and whether created by you.  All such assets and copies thereof, whether in electronic form, hard copies, or otherwise, are the sole and exclusive property of the Company and demand is made upon you for the immediate return of such property.

I would also like to remind you that during your tenure as a director, officer, and employee of the Company, considerable resources have been devoted to developing trade secret and other proprietary data currently residing with and owned by the Company.  You should understand that given the value and importance of the Company's trade secret and proprietary data, should anyone at the Company learn that such data has been or is going to be misappropriated, the Company will have no choice but to seek legal redress against you and any other individuals or company involved in the misappropriation.

Please contact me at your earliest convenience to schedule a time for the return of company property as set forth above at which time we can pay your final compensation.

Sincerely,

John A. Dowdy, Director
Meredian Holdings, Group, Inc.

agroreco    agrocrush    danimer    meredian

140 Industrial Boulevard    |    Bainbridge GA 39817    |    www.meredianinc.com

# EXHIBIT G

 Ius Laboris USA Global HR Lawyers
FordHarrison

271 17th Street, NW | Suite 1900
Atlanta, Georgia 30363
Tel 404-888-3800 | Fax 404-888-3863

Writer's Direct Dial:

PATRICIA G. GRIFFITH
404-888-3831
pgriffith@fordharrison.com

December 23, 2015

**BY HAND DELIVERY**

Mr. Edward Krugman
Bondurant Mixson & Elmore LLP
One Atlantic Center
1201 West Peachtree Street NW
Suite 3900
Atlanta, GA 30309

Re:  <u>Paul Pereira and Alton Entities</u>

Dear Edward:

This follows my earlier email to you concerning our client, Meredian Holdings Group, Inc. ("Meredian") and Paul Pereira, whom you represent.  This letter serves as Meredian's formal notice that it hereby rescinds the August 2, 2013 Memorandum of Understanding and the subsequent April 25, 2014 Consulting Contract, as well as the March 1, 2014 Subscription and Stock Purchase Agreement, the June 15, 2014 Nonqualified Deferred Compensation Agreement, the January 5, 2015 Incentive Stock Option Agreement, and the January 12, 2015 Stock Option Agreement[1] (collectively "the Agreements") that the Company entered into with Paul Pereira and his companies, Alton Consulting Group, LLC ("Alton Consulting"), Alton Bio, LLC, and Alton Bio I, LLC. The basis of this action is Mr. Pereira's fraud in procuring the Agreements.  Meredian hereby demands return of all shares of its stock and/or stock options held by Mr. Pereira or one of the companies he controls and all of the cash paid to Mr. Pereira's companies pursuant to the Agreements.  Meredian will permit Mr. Pereira to retain $112,914.59 representing the salary and benefits paid to him by the Company for his services as CEO as the quantum meruit value of the services provided by Mr. Pereira and Alton Consulting.

Mr. Pereira's fraud includes, but may not be limited to:

---

[1] The January 12, 2015 Stock Option Agreement was never executed, and thus, a valid contract was never formed.  Even if a valid contract were formed, Meredian hereby rescinds the Stock Option Agreement.

Mr. Edward Krugman
Bondurant Mixson & Elmore LLP
December 23, 2015

1.  The falsification of a resume which was relied upon by Meredian in its
    decisions to enter into and continue its relationship with Mr. Pereira and
    his companies; and

2.  The entry into, performance of, and failure to disclose, an arrangement
    whereby Mr. Pereira and/or his companies delivered a portion of the
    incentive pay granted to them by Meredian to a member of Meredian's
    Board of Directors.

The latter arrangement resulted in conflicting interest transactions within the
meaning of O.C.G.A. § 14-2-860, rendering the agreements between Mr. Pereira and/or
his companies and Meredian voidable and providing another basis on which Meredian
relies in rescinding the Agreements.

Mr. Pereira may avoid litigation by simply delivering to Meredian all shares of its
stock in his possession or control and a notice of cancellation as to any outstanding
options, as well as all cash and other assets that Mr. Pereira has wrongfully converted
to his personal use.  Please contact me if you have any questions.

Yours Very Truly,

PATRICIA G. GRIFFITH

PGG/jla

WSACTIVELLP:8160833.1